# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

|  |  |  |
|---|---|---|
| NITZA WRIGHT | ) | |
| | ) | |
| Plaintiff | ) | CASE NO.: |
| | ) | |
| | ) | |
| | ) | **COMPLAINT** |
| CHARLOTTE BURROWS, CHAIR, | ) | **JURY TRIAL DEMANDED** |
| EQUAL EMPLOYMENT | ) | |
| OPPORTUNITY COMMISSION | ) | |
| | ) | |
| Defendant | ) | |

## I.  NATURE OF THE ACTION

1. This action, under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 and the U.S. Constitution, is brought to correct unlawful discrimination in federal employment based on retaliation, and to secure corrective remedies, including injunctive and declaratory relief for NITZAWRIGHT ("Plaintiff" and/or "Ms. Wright").

2. Factual allegations follow that detail how, from about 2012, and particularly after she exposed unlawful sexual harassment of two employees, Mario Hernandez ("Hernandez") and Robert Tom ("Tom"), by their superior, the Enforcement Supervisor Kathryn Gonzalez ("Gonzalez"), Plaintiff was subjected to unlawful retaliation by the UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Chair Charlotte Burrows ("Defendant", "EEOC" or "Agency").

3. Both Hernandez and Tom sued the EEOC in this court in 2020.

4. Tom prevailed through settlement, and to the best of Ms. Wright's knowledge, Hernandez's case is scheduled for trial later this year.

1

## II.   JURISDICTION AND VENUE

5. Jurisdiction of this Court is invoked per 28 U.S.C. §§ 451, 1331, and 1343. Authority and allowance for this action is permissible pursuant to Sections 706(f)(1) and (3), and Section 717(c) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e-16(c), 2000e-5(f)(1) and (3) et seq. ("Title VII"), and Section 102 of the Civil Rights Act of 1991, as amended, 42 U.S.C.A. §1981, et seq., and the Civil Rights Attorneys' Fees Awards Act of 1976, as amended, 42 U.S.C.A. §1988, et seq.

6. Venue is proper in the United State District Court for the Southern District of Florida, Miami Division, by 42 U.S.C., 2000e-5(f)(3). Additionally, this is the proper venue under 28 U.S.C. Section 1391(e) as the primary actions complained of either occurred within or were directed within the geographical boundaries of the Miami, Florida (Southern District of Florida).

## III.   PARTIES

7. Plaintiff NITZA WRIGHT, a resident of Broward County, Florida, is a Hispanic female who from 2009, at least, until October 2020, was a full time tenured employee of the EEOC in its Miami District Office ("MIDO"), located at 100 SE 2nd Street, Suite 1500, Miami, FL 33131.

8. Defendant EEOC, Chair Charlotte Burrows (sued solely in her official capacity) is a federal agency of the United States that employs over 500 persons, is headquartered at 131 M St. NE, Washington, DC 20507, with several field offices, including the MIDO.

## IV.   ADMINISTRATIVE REMEDIES EXHAUSTED

9. Ms. Wright exhausted prerequisite administrative remedies before filing this Complaint within the 90-day statutory period from January 8, 2022, when her counsel received the EEOC's Final Agency Decision ("FAD") by US Postal Service, certified mail (#7020 0090 0000 5117 4305).

10. The FAD evolved from a formal administrative complaint Ms. Wright filed on or about August 5, 2020.  As to her administrative complaint and all related supplemental submissions, Ms. Wright incorporates them here by reference.

## V.   STATEMENT OF FACTS

11. On May 27, 2020, EEOC served Plaintiff Nitza Wright with a notice of proposed removal ("NPR") "from [her then] . . . position as a GS-14, Enforcement Manager in the Miami District Office . . . and from the federal service. (Exhibit "A", NPR).

12. At the time, Ms. Wright had been a federal employee for over three decades and had worked for EEOC in the MIDO for approximately twenty years.

13. Throughout her entire career, Ms. Wright had no history of discipline.

14. The NPR was prepared by EEOC's designated "proposing official", Thomas Colclough ("Colclough"), then acting District Director in EEOC's office in Charlotte, NC.

15. The NPR developed from an administrative complaint by Haidy Elshater, in which she alleged multiple supervisors had subjected her to unlawful discrimination.

16. Elshater was a subordinate employee of Ms. Wright's, but not a direct report.

17.  Against Ms. Wright, Colclough recognized Elshater's unsupported claims and concluded that Plaintiff's alleged "actions constitute[d] harassment based on religion forbidden by . . . EEOC Order 560.005, and are wholly inappropriate and unbecoming for a Supervisory . . . (Enforcement Manager)."

18. Before deciding on the proposed penalty, Colclough said he "considered all relevant *Douglas[1]* factors", and he closed with this: "Taking these factors into consideration, I find that a proposed removal is both reasonable and appropriate."

---

[1] *Douglas v. Veterans Administration*, 5 M.S.P.B. 313, 332 (1981).

19. EEOC's position is false and a pretext for unlawful retaliation against Ms. Wright.

20. The deficiencies in the Defendant's NPR are stunning and it was issued to Ms. Wright on or about May 20, 2020, merely 2 months after EEOC dismissed her substantive allegations of shocking unlawful employment practices in the MIDO. (Exhibit "B", Wright Decision).

21. Ms. Wright blew the whistle on sexual related activities within the MIDO that were routine and routinely swept under the proverbial rug by senior management, including the then district director, Michael Farrell.

22. None of the persons Ms. Wright exposed were removed from federal service, subjected to proposed termination, or severely punished, and none of the supervisors Elshater alleged mistreated her received or were as harshly treated as Ms. Wright.

23. The EEOC's rush to judgment and flawed rationale to punish Ms. Wright is obvious.

24. On May 27, 2020, the issue date of the EEOC's NPR, the Elshater-related investigation was still ongoing and incomplete.

25. The investigation into Elshater's EEO complaint was not finished until July 9, 2020, or thereabout, some six weeks *after* the NPR's issue date on May 27, 2020.

26. Even later, in early August 2020, EEOC delivered to Ms. Wright's counsel, Elshater's 1560-page final report of investigation ("ROI").

27. The EEOC belated service of Elshater's ROI was detrimental to Ms. Wright. By withholding the ROI from Colclough, she was denied her legal right for the proposing official to state from a complete record, and with clarity, the basis for the proposed discipline.

28. EEOC's proposing official never saw Elshater's ROI.

29. Neither did Ms. Wright's counsel until weeks *after* Rosa Viramontes ("Viramontes"), the Defendant's deciding official had scheduled, compelled, and held Ms. Wright's hearing or oral

rebuttal of the NPR on June 19, 2020, and had refused her counsel's plea to extend that date.

30. During the Elshater investigation, and unquestionably through May 22, 2020, nobody offered, and the proposing official had certainly not received, any evidence supporting Elshater's allegations against Ms. Wright.

31. On the other hand, by then Ms. Wright's affidavit, refuting many of Elshater's claims was available, having been completed on or about March 10, 2020, more than two months before EEOC issued the NPR to Plaintiff.

32. Also available and withheld from the proposing official was an affidavit supervisor Rosemary Caddle's ("Caddle") affirmed on or about March 20, 2020, and in several ways denied Elshater's claims.

33. The lack of evidence to support Elshater's claims were most obvious, or should have been, to every EEOC decision maker.

34. In May 2020, Stan Pietrusiak, ("Pietrusiak ") knew.  He was EEOC's Director of the Office of Equal Opportunity ("OEO") that handled the investigation into Elshater's complaint, and on May 22, 2020, he emailed EEOC management, confirming Elshater's claims were uncorroborated.  He explicitly verified, "there were no other sources for the testimony provided by Elshater".

35. Against the norm, intentionally, and knowingly to Ms. Wright's detriment, Pietrusiak released Elshater's redacted affidavit, "to [allegedly] prevent further discrimination in the MIDO by Ms. Wright" he said.

36. But there never was any substantive prior or later allegation, or proven history, of any discrimination or other offensive wrongdoing by Ms. Wright.

37. Throughout her discipline-free history of federal employment, Ms. Wright received recommendations, accolades, and glowing performance evaluations.

38. The documentation EEOC gave Colclough to decide whether to issue the NPR to Ms. Wright excluded such facts.

39. Still, to address the requisite "Douglas Factors" as they pertain to Ms. Wright, the proposing official concludes on page 3 of the NPR that, "To my knowledge, you do not have any disciplinary actions on your record."

40. Worse than not giving credit to Ms. Wright for the absence of discipline, is that Colclough either didn't inquire at all, or he got that detail from somewhere or somebody else through an *ex parte* communication.

41. EEOC's proposing official authored a shoddy, one-sided, biased NPR, unsupported by the evidence considered and factors overlooked.

42. The NPR confirmed Ms. Wright's statutory entitlement to review the material the Agency relied upon to support the proposed disciplinary action.

43. Promptly after receiving the NPR on May 20, 2020, Ms. Wright asked for the material Colclough reviewed and considered.

44. Her request was unfulfilled for almost thirteen days.

45. She retained counsel who followed up on the request.

46. In an email dated June 9, 2020, Viramontes acknowledged receiving the designation of representation from Plaintiff's counsel, and she attached to the email the documents the proposing official relied on to issue the NPR.

47. Viramontes sent these documents: an affidavit from Alyssa Keene; an email Viramontes got from Nicholas Inzeo ("Inzeo"), forwarding the email he received from Pietrusiak dated May 22, 2020 about "the proposed disciplinary action for Nitza Wright from the Haidy Elshater v. EEOC complaint; a redacted copy of Elshater's affidavit on her own behalf; and Exhibit "A", the 30-page decision EEOC issued on March 20, 2020 rejecting Ms. Wright's personal

complaint against EEOC, which had nothing to do with Elshater.

48. Nowhere in that document is Elshater directly or indirectly mentioned.

49. In another email Ms. Wright's counsel received on June 10, 2020, from Viramontes, she confirmed that the documents she sent the day prior were those Colclough solely relied upon.

50. Then on June 17, 2020, an EEOC lawyer, Yolanda Owens ("Owens"), the Director, Labor and Employee Relations, responded to a third email request Ms. Wright's counsel sent about the documents reviewed to decide the NPR. For a third time EEOC confirmed that Colclough only reviewed the attachments Viramontes emailed on June 10, 2020, including the decision in Ms. Wright's separate, individual case.

51. Without examining relevant evidence including available affidavits, Ms. Wright's in particular and at a minimum, it strains credulity to believe anything but that EEOC targeted Ms. Wright for removal for unlawful retaliatory reasons.

52. EEOC also violated Plaintiff's due process rights through Colclough's *ex parte* communication that she reasonably believes and alleges occurred.

53. Defendant further deprived Plaintiff of due process because: (a) EEOC's did not ensure Colclough had meaningful, relevant documentation to consider, including Ms. Wright's affidavit; (b) also, he did not ask for the available material, or additional, possibly exculpatory evidence from other affiants beside Elshater; and (c) EEOC, without notice or an opportunity to oppose, unilaterally and unlawfully altered the issued NPR and thereby deprived Ms. Wright of a guaranteed right the NPR declared: "You will remain in active duty status during this advance notice period." (Exhibit "A", p 5)

54. On June 3, 2020, a week after EEOC issued the NPR, Defendant deprived Ms. Wright of the guarantee and removed her from active-duty status as Enforcement Manager in the MIDO.

55. EEOC, through its then Chair, condoned the action taken by the senior EEOC official, Nicholas Inzeo, director, Office of Field Programs, who removed Ms. Wright from active-duty status into a forced paid leave status.  Per a June 3, 2020, directive, EEOC barred Plaintiff from "any EEOC premises" and from "participat[ing] in any work-related activities".

56. EEOC ignored Ms. Wright's objection and refused to acknowledge repeated pleas she made to EEOC for an explanation for the unauthorized disciplinary measure without advance notice or affording her an opportunity to respond before denying her right to work for over four months.

57. EEOC schemed to remove Ms. Wright all along, and the NPR was used in bad faith. The document proclaimed that a final decision of whether to uphold the proposed removal would be made by deciding official, Viramontes.

58. But the decision was a forgone conclusion.  On May 29, 2020, less than 72 hours after EEOC issued the NPR, and 5 months before Viramontes' ruling, EEOC advertised and sought applicants for Ms. Wright's vacant job.

59. EEOC mischaracterization of Ms. Wright's removal from active to inactive duty status as "paid administrative leave" was improper and bold.

60. EEOC's outdated internal policy that defines "administrative leave" simply as an "absence from duty administratively authorized without loss of pay or charge to leave" EEOC Order 550.007, Appendix A, p. A-1, ¶10.

61. That policy was inapplicable in cases like Ms. Wright's and obsolete.

62. EEOC's definition of "administrative leave" is contrary to law.  Under 5 U.S.C. § 6329a(a) "the term 'administrative leave' means leave— (A) without loss of or reduction in— (i) pay; (ii) leave to which an employee is otherwise entitled under law; or (iii) credit for time or service; and (B) that is not authorized under any other provision of law". 5 U.S.C. §6329a(a)(1).

63. Ms. Wright did not meet the foregoing criteria.  Furthermore, in any calendar year "an agency may place an employee in administrative leave for a period of not more than a total of 10 workdays." 5 U.S. Code § 6329a(b).

64. Ms. Wright's alleged "administrative leave" exceeded that, by a lot.

65. More than once, including a letter emailed on July 10, 2020, to EEOC, Ms. Wright's counsel complained to no avail about the unlawful "administrative leave" decision that was imposed against Plaintiff.

66. By violating the procedural right to which she was entitled per notice in the NPR, the leave EEOC forced on Ms. Wright was retaliatory punishment, tantamount to a suspension, and a further denial of her right to due process.

67. The leave EEOC improperly imposed on Plaintiff after issuing the NPR was "notice leave", statutorily defined as "leave . . . in which an employee who is in a notice period is placed. 5 U.S.C. §6329b(a)(8)(C).

68. "[N]otice period' means a period beginning on the date on which an employee is provided notice required under law of a proposed adverse action [like future termination] against the employee . . .."  5 U.S.C. §6329b(a)(9).

69. EEOC denied Ms. Wright due process by violating 5 U.S.C. §6329b(b).

70. Placement on "notice leave" is conditional: "An agency may place an employee in leave under paragraph (1) only if the agency has- (A) made a determination with respect to the employee that the continued presence of the employee in the workplace . . . while the employee is in a notice period . . . may- (i) pose a threat to the employee or others; (ii) result in the destruction of evidence relevant to an investigation; (iii) result in loss of or damage to Government property; or (iv) otherwise jeopardize legitimate Government interests . . .. 5 U.S.C. §6329b(b)(2).

71. To Plaintiff's detriment, EEOC violated its notice leave obligations under the law.

72. EEOC's action against Ms. Wright was to punish her for having complained about management in the MIDO, often referred to as camp-run-amuck, and for exposing the debacle involving Katherine Gonzalez, the supervisor in the MIDO whose sexual harassment of two, subordinate, male employees still reverberate throughout the Agency.

73. Plaintiff's engagement in protected EEO activity, she has suffered the adverse employment actions alleged above. Such actions would deter a reasonable employee from engaging in EEO activity.

74. The adverse employment actions, misconduct, acts and omissions, to Plaintiff's detriment, were all taken (or not taken) by EEOC management in the MIDO and/or EEOC headquarters in retaliation for the protected EEO activity of the Plaintiff. As a result, Ms. Wright's employment was negatively affected in several forms like anger, anxiety, stress, weight gain/loss, and sleepless nights.  She has suffered physically, and emotionally, endured embarrassment, and compelled to pay to retain counsel to fight for her rights.

## VI.    ENTITLEMENT TO RELIEF

### COUNT I: Retaliation (Title VII, 42 U.S.C. §§ 2000(e), et. Seq.

75. Ms. Wright incorporates by reference all foregoing allegations in paragraphs 1 - 76.

76. Based on Ms. Wright's allegations, EEOC is liable for retaliating against her for engaging in protected activity.

### COUNT II: (Deprivation of Due Process)

77. Ms. Wright incorporates by reference all foregoing allegations in paragraphs 1 - 78.

78. The 5th Amendment to the U.S. Constitution is clear: "No person shall be deprived of life, liberty, or property, without due process of law.

79. Based on the foregoing allegations, EEOC denied to Ms. Wright the right to due process and is therefore liable to Plaintiff.

10

## **PRAYER FOR RELIEF**

Wherefore, the Plaintiff Nitza Wright respectfully asks this Court to:

A.      Void the NPR and enjoin enjoining Defendants, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from subjecting male employees to unwelcome, sexually graphic and vulgar sexual harassment and retaliation for opposing such harassment.

B.      Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities to eradicate unlawful, retaliation in employment.

C.      Order Defendants to amend Plaintiff's personnel file as needed.

D.      Order Defendants to reimburse Plaintiff for reasonable fees, costs under 42 U.S.C.A. § 2000e-5, and

E.      Grant such further relief as the Court considers necessary and proper under the circumstances in the public's interest.

## **CONFIRMATION OF JURY TRIAL DEMAND**

Per Rule 38, Fed, R. Civ. P., Ms. Wright respectfully requests a trial by jury on all issues.

Dated: April 8, 2022

**Law Office of Joseph Hughes P.A**

*/s/ Joseph S. Hughes*
**Joseph S. Hughes, Esquire**
Florida Bar No.: 0108228
1141 SE 2nd Ave
Fort Lauderdale, FL 33316
Tel: (954) 256-5125
Fax: (954) 256-5126
Email: jhughes@jhugheslegal.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 8,2022, I electronically filed the foregoing document with with the Clerk of the Court using CM/ECF, through which counsel for parties shall receive notice.

*/s/ Joseph S. Hughes*

**Joseph S. Hughes, Esquire**

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Miami District Office**

Miami Tower
100 SE 2nd Street, Suite 1500
Miami, FL  33131
Intake Information Group:  (800) 669-4000
Intake Information Group TTY:  (800) 669-6820
Miami Direct Dial:  (786) 648-5790
FAX (305) 808-1855
Website:  www.eeoc.gov

**EXHIBIT A**

**MEMORANDUM**

Date**:**          May 27, 2020

To:            Nitza Wright
              Enforcement Manager
              Miami District Office

From:          Thomas Colclough //s//
              Deputy Director
              Charlotte District

Subject:       **Notice of Proposed Removal**

This  is notice that I am proposing remove you from your current position as a GS-14, Enforcement Manager in the Miami District Office of the U.S. Equal Employment Opportunity Commission ("EEOC" or the "Commission") and from the federal service.  This action is proposed pursuant to 5 U.S.C. Chapter 75, 5 C.F.R. Part 752, and EEOC Order 570.001.  This proposal is not a final decision but, if taken, will become effective no sooner than thirty (30) calendar days from your receipt of the proposal pursuant to EEOC Order 570.001, Paragraph 13(a). The reasons for this action are described in the charge and specifications below.

**Summary of Disciplinary Action:** Beginning as early as 2017 and continuing through September 2019, you requested a subordinate employee use her Personally Owned Vehicle (POV) to taxi you from the MDO to a bus station near your home.  During those sometime two-hour car rides, you repeatedly discussed your religious faith with her while disparaging her Muslim faith. You insisted that she attend your church services, apply "holy oil," which you supplied, to her disabled son so he would be healed, and advised her that she would go to hell if she refused to convert to your faith.  You made similar remarks both on the MDO premises as well as when riding in the subordinate employee's vehicle.  These actions constitute harassment based on religion forbidden by the Commission's Harassment Order, EEOC Order 560.005, and are wholly inappropriate and unbecoming for a Supervisory Equal Opportunity Investigator (Enforcement Manager). In assessing this proposed penalty, I considered all relevant *Douglas* factors.

**Charge 1:** Harassing Conduct Violative Of EEOC Order 560.005 And Unbecoming For A Supervisory Investigator—Enforcement Manager

**Specification 1:** You were the Enforcement Manager for Haidy Elshater from approximately March 2016 through September 2019.  During that time, but specifically beginning in 2017, you asked Ms. Elshater to use her POV to drive you from the MDO to a bus station near your home after work, on multiple occasions. The car-ride sometimes took nearly 2 hours during which time you made inappropriate comments about Ms. Elshater's Muslim faith.  Ms. Elshater was your

subordinate employee and indicated she felt compelled to grant your transportation request despite being uncomfortable about the arrangement.

**Specification 2:** You imposed your religious beliefs on the Ms. Elshater by insisting she convert to Christianity while you were fully aware of her Muslim faith. You engaged her in inappropriate conversations, on almost a weekly basis, about her religion. These conversations occurred in your office and when riding in her POV. On one occasion, you told her that she would go to hell if she did not believe/accept Jesus Christ.

**Specification 3:** During one car ride, you made a phone call during which you mocked Ms. Elshater's religion in her presence. You stated that her faith was the religion of terrorists and that she was confused.

**Specification 4:** You pressed Ms. Elshater to attend your Christian church service. She felt obligated to do so because you were her supervisor and she attended one service.

**Specification 5:** You told Ms. Elshater that her disabled son was possessed with demons because of her religion. You then gave Ms. Elshater a bottle of "holy oil" and later asked if she used it on her son.

**Charge 2: Failure to Comply with the Agency's Courtesy in Dealing with the Public Policy**

**Specification 1:** You failed to display polite behavior toward your subordinate employee and demonstrated unacceptable conduct by attempting to convert her from her Muslim faith to your Christian faith. On several occasions, you suggested to her that her faith was the faith of terrorists that that she would be condemned to hell if she did not convert.

**Analysis of the Penalty**

In determining the appropriateness of this penalty in this matter, I have considered the relevant factors enumerated in *Douglas v. Veterans Administration*, 5 M.S.P.B. 313, 332 (1981), as explained below.

**The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated.**

Your conduct is most egregious given your role and influence as a supervisor. You requested an employee taxi you from the MDO to another location all while intruding into her personal and religious preferences. Your misconduct was frequent and not an isolated incident. You attempted to impose your religious beliefs upon a subordinate employee as often as several times each week. It appears your actions were intentional and motivated by your desire to force your beliefs on a subordinate.

**The job level and type of employment, including contacts with the public, and prominence of the position.**

You are a supervisor and maintain significant contacts with the public during outreach events and on a day to day basis. Your conduct is indicative of a lack of discretion which could easily translate into using your position to impose your beliefs of the public we serve.

**Past disciplinary record.**

To my knowledge, you do not have any disciplinary actions on your record.

**Past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability.**

You have accumulated numerous individual and group performance-based awards during your career. That said, your conduct as the MIDO Enforcement Manager toward a subordinate employee causes doubt and raises significant questions regarding the methods used to the influence your subordinate employees. Moreover, having been employed with the Commission for several decades, you should be aware of the Commission's policies, standards of conduct and expectations regarding misconduct of this kind particularly given the statutes we are charged to enforce.

**The effect of the offense upon your ability to perform at a satisfactory level and its effect upon the supervisor's confidence in the employee's ability to perform the assigned duties.**

Your conduct totally undermines any confidence in your ability to supervise employees and to properly oversee investigations alleging religious discrimination. Subordinate employees should not feel obligated to conform their religious beliefs to your personal preferences, religious or otherwise. Your conduct as explained in the charges and specifications above demonstrates your inability to satisfactorily perform your duties as a supervisor or an investigator.

**Consistency of penalty with those imposed upon other employees for the same or similar offenses.**

To my knowledge, the Commission has never been previously confronted with misconduct of the type alleged here.

**The notoriety of the offense or its impact upon the reputation of the agency.**

Your actions reflect poorly upon the Commission. Though your conduct was only recently reported to the Office Of Equal Opportunity, Ms. Elshater complained that she has become physically ill and was forced to take significant amounts of leave to address the impact of your actions toward her. Considering the Commission's enforcement role, i.e., to thwart discrimination of any kind, you have negatively impacted the Commission's mission and reputation.

**The clarity with which notice was given regarding the rules that have been violated in committing the offence, or had been warned about the conduct in question.**

The Commission has long-standing policies governing the conduct of its employees which prohibit discrimination, harassment and other inappropriate conduct. As a high-level Commission manager, you are indisputably aware of our mission to eradicate, inter alia, religious discrimination. As you know from your training and experience in enforcing the prohibition against religious discrimination in Title VII, conduct of the type charged here would in a cause finding against a private sector employer. These policies have long been located on the Commission's internal webpage and are readily available to you and all employees. You were thus on clear notice that your actions were violative of the Courtesy in Dealing with Public Policy, the Harassment Prevention Policy, as well as the rules and regulations the Commission enforces regarding religious discrimination.

Notably, you are tasked, as an Enforcement Manager, to model appropriate leadership and professional behavior by treating others with respect, directing and motivating staff, and maintaining confidentiality. You were expressly notified of this standard as part of your performance standards.

**Potential for the rehabilitation.**

I do not believe you can be rehabilitated after conducting yourself in such a manner. Your conduct was frequent, persistent and entirely unacceptable.

**Mitigating circumstances surrounding the offense such as unusual job tension, personality problems, mental impairment, harassment, or bad faith, malice, or provocation on the part of others involved in the matter.**

I understand that you have had medical issues and stressors while in your role as Enforcement Manager. However, those stressors do not excuse you from complying with the Commission's policies and expectations regarding religious preference. It is inconceivable that any stressor would cause you to act in such a manner.

**12. The adequacy and effectiveness of alternative sanctions to deter such conduct in the future**

I have considered alternative sanctions and this proposed removal is the most adequate measure to promote the efficiency of service—i.e., given these circumstances.

**Conclusion**

An agency is entitled to hold a supervisory employee to a higher standard of conduct than other non-supervisory employees. Although your past work record/performance and length of Federal service of may weigh in your favor, these factors do not suggest that the proposed penalty should be mitigated when all other relevant *Douglas* factors, particularly the seriousness of your

misconduct, the notoriety of the offence, the impact to the Commission's reputation, and your ability to satisfactorily perform your duties as an Commission Enforcement Manager, weigh strongly against mitigation. Your conduct has adversely impacted overall productivity and public trust in the Commission.

Taking these factors into consideration, I find that a proposed removal is both reasonable and appropriate.

**<u>Employee Rights</u>**

Please carefully read these rights below. If you have any questions about this action or your rights pertaining to this action, you or your representative may contact Yolanda Owens, Director Employee and Labor Relations, at Yolanda.owens@eeoc.gov.

You will remain in active duty status during this advance notice period. A written decision shall be made within 30 days after the date of the advance notice period or any extensions thereof, unless the deciding official extends the advance notice period, as appropriate.

In accordance with EEOC Order 570.001, Paragraph 13(a), you may answer this notice orally and/or in writing **within fifteen (15) calendar days from the date you receive this notice**. You have the right to review the material relied upon in support of this proposed action, submit affidavits and/or other documentary evidence in support of your reply, and to be represented by an attorney or representative of your choosing. You must provide a written designation identifying your attorney, or other representative.

Rosa Viramontes will be the Deciding Official for this action. Your reply must be made to the attention Rosa Viramontes, Director, Los Angeles District Office, at <u>rosa.viramontes@eeoc.gov</u>; copying Yolanda Owens, at <u>yolanda.owens@eeoc.gov</u>. Consideration will be given to extending the fifteen (15) calendar day response period if you submit a request in writing to Rosa Viramontes stating the reasons for your request.

You may be allowed up to eight (8) hours of official time to prepare your response, provided you are in an active duty status and you request prior approval from Yolanda Owens. Please contact me if you elect to use duty time in preparing your response. This period does not extend the deadline for submitting your verbal and/or written response. Granting duty time to prepare a response does not extend the time allowed to answer.

Rosa Virmontes will hear and consider any oral and/or written response you make in arriving at a final decision. You will receive a final decision expeditiously after your answer has been considered or after the time allowed for an answer, if none is received. You will remain in an active duty and pay status until a final decision is rendered, sustaining, mitigating, or nullifying the proposal.

Again, any questions concerning the contents of this letter, your rights, or the procedures involved, should be directed to Yolanda Owens, Director, Labor and Employee Relations, yolanda.owens@eeoc.gov.

**<u>Acknowledgment of Receipt</u>:**

I hereby acknowledge receipt of this letter on    <u>5/27/2020</u>.
                                                               Date

_____
NAME

Exhibit B



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C. 20507**
**OFFICE OF EQUAL OPPORTUNITY**

Office of the Chair

| | |
|---|---|
| Nitza Wright, | ) |
| 1911 N. 44th Avenue | ) |
| Miami, FL 33021 | ) |
|              Complainant | ) |
| | ) |
| and | ) |
| | ) |
| Janet Dhillon, Chair, | ) |
| Equal Employment Opportunity | ) |
|   Commission, | ) |
| 131 M St. NE | ) |
| 6th Floor | ) |
| Washington, DC 20507 | ) |
|              Agency. | ) |
| | ) |

EEO Complaint No. 2018-0025

## FINAL AGENCY DECISION

This is the Final Agency Decision (FAD) of the Equal Employment Opportunity Commission (EEOC or Agency) on the above-captioned Equal Employment Opportunity (EEO) complaint. The complaint was filed by Nitza Wright (Complainant) under Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e *et seq*.

For the reasons set forth below, we find that Complainant has not established by a preponderance of the evidence that the Agency subjected her to discrimination, reprisal, or harassment as alleged. As a result, we DENY this claim.

## PROCEDURAL ISSUES AND CLAIMS PRESENTED

On April 11, 2018, Complainant contacted the Office of Equal Opportunity (OEO) to initiate EEO Counseling.  *See* Report of Investigation (ROI) at Section (§) 2.2.[1]  Complainant alleged that she has been subjected to retaliation with regard to terms and conditions of employment, including the assignment of duties, and retaliatory harassment[2] from June 2016 through the present.  *Id.*  By letter dated July 9, 2018, Complainant was issued the Notice of Right to File a Formal Complaint (NORTF). § 2.4.  On July 20, 2018, Complainant timely filed a formal EEO complaint.  ROI § 1.1.

---

[1] While the EEO Counselor's report notes that Complainant initiated EEO contact on April 11, 2018, the record shows that the Office of Equal Opportunity investigated various allegations of discrimination and harassment at the Miami District Office beginning in October 2017, and Complainant was interviewed during that investigation.

[2] While Complainant described her claim as "non-sexual harassment," she did not raise any bases besides retaliation.

Complainant initially requested an administrative hearing on April 11, 2019, but subsequently withdrew her request.    Accordingly, the Agency now issues this FAD pursuant to 20 § C.F.R. 1614.110(b).

**Accepted Claims**

By letter dated September 26, 2018, OEO accepted the following claim for investigation.  § 3.1.

> Whether Complainant has been subjected to retaliatory harassment and unequal terms and conditions of employment on the basis of retaliation from February 25, 2018 to present when the Miami District Office (MIDO) District Director:
>
> 1. removed a number of Complainant's supervisory duties while still requiring Complainant to sign off on those duties (approval of leave and submission of evaluations and cash awards) as if still performed by Complainant;
>
> 2. ordered Complainant not to have meetings with her subordinates (supervisors and investigators);
>
> 3. excluded Complainant from both general meetings regarding the MIDO and meetings specifically involving employees under her supervision;
>
> 4. hired a former MIDO Deputy Director as a contractor even though the District Director was aware of this individual's knowledge and complacency regarding inappropriate sexual behavior by a MIDO Enforcement Supervisor, and the individual's discriminatory animus toward Complainant;
>
> 5. demonstrated to Complainant and the MIDO staff that he supported a former MIDO Enforcement Supervisor, despite receiving evidence and reports by both MIDO employees and managers of the former Enforcement Supervisor's inappropriate sexual behavior and misconduct, which discouraged Complainant from participating in the EEO and Harassment Prevention Programs; and
>
> 6. encouraged and assisted the former Enforcement Supervisor in filing an EEO complaint against Complainant.

ROI § 3.1.

**Dismissed Claims**

As noted, Complainant alleged that the above-referenced harassment, and retaliation began in June 2016.  The Agency stated, however, that Complainant did not contact an EEO Counselor until April 2018, nearly two years later.

Pursuant to 29 C.F.R. § 1614.107(a)(2), an agency shall dismiss a complaint where a complainant fails to comply with regulatory time limits.  An aggrieved person is required to contact an EEO Counselor within 45 days of the matter alleged to be discriminatory (or, in the case of a personnel action, within 45 days of the effective date of the action). The agency applies a "reasonable suspicion" standard to trigger the date for determining the timeliness of the contact with the EEO Counselor.  Under this standard, the period for contacting an EEO Counselor is triggered when Complainant should reasonably suspect discrimination, but before all the facts to support a charge of discrimination may have become apparent.

The United States Supreme Court has held, however, that a complaint alleging a hostile work environment will not be time barred if all acts constituting the claim are part of the same unlawful practice and at least one act falls within the filing period.  *See National R.R. Corp. v. Morgan*, Jr., 536 U.S. 101, 113 (2002); *Colton v Dep't of Treasury*, EEOC Appeal No. 0120092838 (Sept. 28, 2009).  The Court further held, however, that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  The Court defined such "discrete discriminatory acts" to include acts such as termination, failure to promote, denial of transfer, or refusal to hire, acts that constitute separate actionable unlawful employment practices.

The Agency concluded that, based upon the written material submitted by Complainant and the fact that Complainant, as a management official, received training on the Agency's EEO and Harassment Prevention process, Complainant had sufficient information to reasonably suspect discrimination prior to her April 2018 contact with the EEO Counselor.  Therefore, the Agency dismissed claims concerning discrete acts which occurred outside of the 45-day limitation period.  The Agency indicated, however, that those acts would be considered as background evidence in support of Complainant's timely-accepted harassment and retaliation claims.  ROI § 3.1.

While the Agency stated that it was dismissing "untimely discrete acts," the Agency did not articulate what specific acts it was referring to.  Further, although the Agency indicated it was dismissing acts that occurred prior to Complainant's April 11, 2018 contact with the EEO Counselor, it characterized the accepted claims as occurring from February 25, 2018, to the present.  Pursuant to 29 C.F.R. § 1614.105(a)(2), incidents that occur within 45 days prior to a complainant's EEO contact are timely.  Therefore, all matters from February 25, 2018, forward are deemed to have been accepted as timely.

## BACKGROUND AND STATEMENT OF FACTS

### *Summary of Complainant's Claim*

Complainant has been employed by the Agency as an Enforcement Manager in the MIDO since April 2009.  Her first-line supervisor is MIDO Director Michael Farrell.  ROI §§ 1.4, 1.5, 1.6 & 1.7.  Complainant explained that her principal job duties are to oversee all aspects of the MIDO's private sector Enforcement Unit and respond to Congressional inquiries.  Complainant stated that it is her responsibility to ensure that MIDO meets its goals.  ROI § 1.4.

Complainant stated that, in or about 2007, she was a witness in an investigation by the Agency's Office of Inspector General (OIG) of prior MIDO Director Federico Costales' alleged discriminatory behavior. ROI § 1.4. Complainant indicated that MIDO management believed Complainant initiated this investigation. *Id*. Complainant also noted that Mr. Costales was angry Complainant did not complete a statement supporting him. ROI § 1.2.

Complainant asserted, in her statement to the EEO Counselor, that Director Farrell came to the MIDO in February 2016 with a "great disposition," and positive plans for the future of the office and the MIDO management team. ROI § 1.2. For many months, Director Farrell included Complainant in all District meetings and treated Complainant like the "second in command" in the office. Id. During staff meetings, Director Farrell expressed that Complainant was "his right hand," doing two jobs (Deputy Director and Enforcement Manager), and doing well. Id. Complainant also noted that she was in charge when Director Farrell traveled, and Director Farrell relied on Complainant to complete reports for Headquarters. ROI § 1.4.

Director Farrell assigned Complainant to be the Acting Director of the Tampa Field Office.[3] ROI § 1.2. When Complainant returned to the MIDO, Director Farrell told Complainant he and former Deputy Director Ozzie Black had been visiting former Director Costales. Id. Complainant asserted that Director Farrell told her he held Mr. Costales and Mr. Black in high esteem. *Id.* Complainant then suspected she would be subjected to retaliation. *Id*.

Complainant stated that, in 2016, Mercedes Ricardo told her that Robert Tom was being sexually harassed by his supervisor Katherine Gonzalez. ROI § 1.4. Complainant and Ms. Ricardo met with Mr. Tom, who indicated that Ms. Gonzalez asked him to have sex with her in the elevator. *Id*. Complainant reported the allegations to Director Farrell, who told Complainant to "stay out of it," and he would "handle it." *Id*. Complainant stated that nothing was done, and the environment in the office became "very hostile," which affected production. ROI § 1.2. Complainant claimed that Director Farrell told her Supervisory Administrative Judge (SAJ) Patrick Kokenge investigated the matter, and Mr. Tom "denied everything." ROI § 1.4.

Sometime later, Director Farrell showed Complainant a photo of Ms. Gonzalez's breasts that had been taken in the office.[4] ROI § 1.2. Complainant asserted that Director Farrell told her not to tell anyone about the picture, that he was going to hide a photo inside his desk, and that he was not going to show the photo to anyone at Headquarters. *Id*. Director Farrell subsequently told Complainant that Agency Headquarters received a letter complaining about a hostile environment in the MIDO, and management's failure to take action. *Id*. Director Farrell indicated to Complainant that he believed she participated in writing the letter. *Id*.

Complainant stated that she then began to notice subtle changes in Director Farrell's behavior toward her. ROI § 1.2. For example, Complainant noted that Director Farrell told her not to meet with supervisors, forbid her to meet with staff, and excluded her from meetings. *Id*. Complainant

---

[3] It is unclear from the record when exactly this occurred.

[4] Complainant did not state when exactly this occurred, but it appears to have been sometime in 2017.

no longer believed Director Farrell considered the second in command and felt she had no authority.  *Id.*

Complainant participated as a witness in the EEO investigation of a sexual harassment complaint filed against former Enforcement Supervisor Katherine Gonzalez in October 2017.  In addition, Complainant spoke with two OIG inspectors who came to the MIDO in December 2017, about Ms. Gonzalez's conduct and sexual harassment claims.  ROI § 1.2.  Complainant asserted that Director Farrell knew that OIG was coming to the MIDO, and told Complainant he received a phone call about the visit prior to OIG's arrival.  ROI § 1.6.  Complainant stated that, after OIG questioned her, Complainant told Director Farrell that the investigation related to Ms. Gonzalez's sexual misconduct.  Director Farrell responded that he knew the purpose of OIG's visit.  *Id.*

Complainant noted that Ms. Gonzalez was demoted and suspended in January 2018.  ROI § 1.2.  Complainant stated that Director Farrell discussed Ms. Gonzalez's proposed discipline with Complainant because she was Ms. Gonzalez's supervisor and needed to know the impact any discipline would have on the Unit.  ROI § 1.6.  Complainant asserted that Director Farrell told her that he and the Office of Field Programs Director agreed that Ms. Gonzalez would only receive a 10-day suspension, and Ms. Gonzalez could decide when the days would be imposed so that she would not be financially affected.  ROI § 1.4.  Complainant indicated that Ms. Gonzalez ultimately received a 30-day suspension because OIG intervened in the matter.  *Id.*

According to Complainant, Director Farrell stated that the two employees who claimed Ms. Gonzalez sexually harassed them were not victims, but that Ms. Gonzalez was the victim because the two men took advantage of her.  ROI § 1.6.  Complainant indicated that she believed Ms. Gonzalez should have been terminated, and Director Farrell told her that was why he and Complainant were "on different terms."  *Id.*  Complainant also stated that Director Farrell told her he was on "Team Kat."  *Id.*  Complainant claimed that she told Director Farrell that people who supported Ms. Gonzalez had no integrity.  ROI § 1.4.  Complainant contends that there is no other explanation for the matters alleged in her complaint but retaliation for her participation in the investigation of sexual harassment claims against Ms. Gonzalez.  *Id.*

Complainant stated that Director Farrell removed a number of her supervisory duties in retaliation for Complainant's protected activity, while continuing to require Complainant to "sign off" on those actions.  ROI § 1.6.  Complainant cited approval of leave requests, performance evaluations, and cash awards as examples of duties that were removed by Director Farrell.  *Id.*  According to Complainant, she was the only person in the MIDO whose duties were removed.  *Id.*

Complainant stated that the Enforcement Supervisors now go directly to Director Farrell, bypassing Complainant.  ROI § 1.6.  For example, Complainant stated that Enforcement Supervisor Peters now reports directly to Director Farrell, but Complainant is still required to sign her leave requests even though she had no knowledge of or control over Ms. Peters' leave or schedule.  *Id.*  Complainant acknowledged that after she informed the District Resource Manager that she would no longer continue to certify Ms. Peters' time and attendance, Ms. Peters was removed from Complainant's roster.  *Id.*

According to Complainant, Director Farrell told her that he was removing Ms. Peters from her supervision for Complainant's sake, because it seemed as if her relationship with Ms. Peters was "broken." ROI § 1.6. Complainant denied screaming at Ms. Peters, refusing to look at Ms. Peters at meetings, and commenting that she and Ms. Peters were "at each other's throats" as Director Farrell claimed. ROI § 1.6. Complainant stated that, aside from one incident in which Ms. Peters became upset and yelled at Complainant for asking her to contact a charging party, she and Ms. Peters maintained a "cordial" relationship. *Id*. Complainant noted that, after this one incident, Ms. Peters began reporting to Director Farrell. According to Complainant, Enforcement Supervisor Peters tends to exaggerate situations and made a "big deal" of this situation to justify removing her from Complainant's supervision and allowing her to report directly to Director Farrell. *Id*. Complainant described Ms. Peters as "very difficult to work with," stating that Ms. Peters does not like to be corrected, does not take responsibility, and is never available. ROI § 1.4.

Complainant stated that Director Farrell also instructed her to write and sign the performance evaluation for Investigative Support Assistant Robert Tom even though Complainant is not Mr. Tom's supervisor. ROI § 1.6. Complainant noted that Mr. Tom is supervised by Intake Unit Supervisor Linda Byars, and the Enforcement Supervisors who are on Intake rotation.[5] Complainant stated that she does not assign work to Mr. Tom. Id. She stated that Director Farrell told Complainant her only role was to write Mr. Tom's evaluation based on information provided by his supervisors. *Id*.

Complainant claimed that she is not included in meetings or "MRGs" (case review meetings with MIDO Enforcement teams). ROI § 1.4. Complainant no longer compiles reports for Headquarters, and Enforcement Supervisors now use a stamp with her signature for issuing "no cause" decisions. *Id*. Complainant was not aware of any initiative to delegate signature authority to lower-grade employees. ROI § 1.6.

Complainant claimed that Director Farrell told her that she was not to meet with her subordinates, including any employee in the Enforcement or Intake units, and not to hold "MRG" meetings. Complainant stated that Director Farrell now "runs" the Enforcement unit and holds the MRG meetings. ROI § 1.4. Complainant stated that if she enters Director Farrell's office when he is meeting with her subordinates he comments that she is "welcome to stay." *Id*. Complainant also indicated that Enforcement Supervisors "bypass her" and meet directly with Director Farrell regarding personnel issues before informing Complainant of the problems. *Id*. Complainant stated that she now learns about incidents involving employees under her supervision months after the incidents occurred. *Id*.

Complainant stated that Director Farrell held a meeting in March 2019 to discuss a plan he developed with Ms. Peters. ROI § 1.4. Complainant indicated that while Director Farrell told the attendees that Complainant had reviewed the plan, Complainant was actually excluded from the planning process. *Id*.

---

[5] Complainant also stated, however, that Director Farrell assigned Mr. Tom to work under her supervision. ROI § 1.4.

Complainant stated that, prior to her expressing opposition to Ms. Gonzalez's sexual misconduct, she was always included in meetings with the Tampa and San Juan Office Directors.  ROI § 1.4. After that time, however, Complainant claimed she was no longer invited to participate in  these meetings.  ROI § 1.5.  Complainant indicated that "from time to time," she would find Director Farrell meeting with the Tampa and San Juan Directors, and while she would overhear Director Farrell discussing district-wide issues and special projects, and he indicated he would let her know what was discussed at the meetings, Director Farrell would only tell her it was "nothing of importance."  ROI § 1.6.

Complainant noted that she has been recognized for her willingness to  assist the agencies she has worked for at any level, and has never expressed that working on a special project was a "punishment."  ROI § 1.6.  She volunteered to work in the Tampa office after Director Farrell expressed concern that two managers retired at the same time.  *Id.*  Complainant stated that Director Farrell liked her suggestion that she supervise the Tampa office remotely to save the Agency money.  *Id.*  Complainant noted, however, that after her Tampa assignment, issues resurfaced regarding Ms. Gonzalez's conduct, and Director Farrell no longer asked Complainant to assist in any office.

Complainant noted that she was allowed to work in the San Juan office, to assist her father after her mother passed.  ROI § 1.6.  Complainant stated she was not in charge of that office. Complainant emphasized that she never refused requests from Director Farrell to assist other offices because he did not request her assistance.  *Id.*

Complainant asserted that Director Farrell hired former Deputy Director Ozzie Black as a contractor in 2018, because he knew it would negatively impact Complainant.  ROI § 1.4. Complainant claimed that Mr. Black never liked or respected her when he worked at the MIDO. *Id.*  Complainant opined that Mr. Black did not like her because she was not Black, but stated that she did not complain because she always received good evaluations.  *Id.*

According to Complainant, Mr. Black knew of and was complacent regarding Ms. Gonzalez's inappropriate sexual behavior when he was Deputy Director.  ROI § 1.4.  Complainant stated that, when she reported to Mr. Black that Ms. Gonzalez was sending inappropriate messages to her subordinate, Mr. Black, who made a "zipped lips" gesture.  *Id.*  Complainant asserted that Mr. Black tried to cover up Ms. Gonzalez's conduct and did nothing to stop it.  *Id.*  Complainant believed Mr. Black exhibited discriminatory animus toward Complainant during that time.

Complainant informed Director Farrell that she told Mr. Black about Ms. Gonzalez's inappropriate messages.  ROI § 1.4.  Complainant denied telling Director Farrell that she believed Mr. Black was racist.  ROI § 1.6.  Complainant believed that Director Farrell brought Mr. Black back to control everyone so that MIDO employees would not talk about what happened with Ms. Gonzalez.  ROI § 1.4.

Complainant stated that Mr. Black worked in the Enforcement Unit, despite Director Farrell's claim that he worked in a different area.  ROI § 1.4.  Specifically, Complainant stated that Mr. Black reviewed cases for Ms. Peters' unit.  *Id.*  Complainant noted that when she returned to work after medical leave, Director Farrell asked her to forgive him for not telling her in advance about

Mr. Black's return.  *Id.*  Director Farrell told Complainant he knew she and Mr. Black "had issues" in the past and that Complainant would be upset.  *Id.*

Complainant asserted that Director Farrell's support of Ms. Gonzalez created a hostile environment for Complainant.  ROI § 1.6.  Complainant noted that, despite being disciplined for inappropriate sexual conduct and moved to another floor, Director Farrell allowed Ms. Gonzalez to come to Complainant's floor and talk to the Enforcement Supervisors and harass the individuals who filed complaints against her, which intimidates Complainant and disrupts her routine.  *Id.*  Complainant indicated that Director Farrell is "very vocal" about his support for Ms. Gonzalez. *Id.*

Complainant believed that Director Farrell did not consider Complainant to be "on his team," because she expressed that Ms. Gonzalez should be fired for sexual misconduct. ROI § 1.6. According to Complainant, Director Farrell repeatedly referred to those who supported Ms. Gonzalez as "Team Kat," and stated that those who did not support Ms. Gonzalez were not on "Team Kat." ROI § 1.6.  After Complainant spoke out against Ms. Gonzalez, Director Farrell told Complainant he was not going to ask to fill the Deputy Director position that he had previously indicated Complainant would receive.  ROI § 1.6.  Complainant noted that Director Farrell told her he was not going to fill the position because Complainant was not "on his team," (did not support Ms. Gonzalez), and Complainant had insisted Ms. Gonzalez needed to be disciplined.  *Id.*

Complainant believed Mr. Farrell only disciplined Ms. Gonzalez because he was forced to by officials at Agency Headquarters.  ROI § 1.6.  Complainant noted that Director Farrell was "very upset" when officials at Agency Headquarters drafted the proposed discipline for Ms. Gonzalez. ROI § 1.6.  Complainant asserted that she spoke with many people at the Agency's Headquarters about the hostile work environment in the MIDO, but the situation did not improve.[6]  ROI § 1.4.

Complainant stated that she was "very clear" with Director Farrell that she did not support the manner in which he handled the sexual harassment complaint against Ms. Gonzalez.  ROI § 1.6. Complainant stated that she noted in Ms. Gonzalez's evaluation that Ms. Gonzalez did not foster an environment of respect, but Mr. Farrell instructed Complainant to give Ms. Gonzalez a good evaluation and a cash award, which Complainant did.  *Id.*  Complainant noted that she believed Ms. Gonzalez would be assigned to her unit after Ms. Gonzalez was demoted from her supervisory position, but Director Farrell told Complainant Ms. Gonzalez would work under his supervision because he did not want Ms. Gonzalez to feel embarrassed about her demotion.

Complainant believed that Director Farrell encouraged Ms. Gonzalez to file an EEO complaint against Complainant so that he could justify moving Ms. Gonzalez to another team.  ROI § 1.4. While Director Farrell claimed that Ms. Gonzalez reports to the Director of the Tampa Field Office, Complainant asserted that Ms. Gonzalez receives work from Supervisor Peters' unit.  *Id.*

Complainant contended that Director Farrell discouraged her from engaging in EEO activity, and actively disparaged the Agency's EEO complaint process.  ROI § 1.6.  Director Farrell told Complainant that Agency managers "do not pay attention" to EEO complaints filed against them

---

[6] It is unclear when Complainant had conversations with employees at Agency Headquarters.

or take the complaints seriously. *Id*. Complainant stated that when she observed Director Farrell protecting and defending Ms. Gonzalez, Complainant believed complaining would hurt not help her. ROI § 1.4. Director Farrell allowed Ms. Gonzalez to keep her office on the 15th floor with her name plate designating her as "Supervisor" after he told MIDO managers that Ms. Gonzalez was reassigned to another floor. ROI § 1.6. Complainant asserted that Director Farrell's actions sent a message to MIDO staff that he was supporting Ms. Gonzalez, and no matter how many complaints were made to Headquarters, nothing would happen to Ms. Gonzalez. ROI § 1.6.

Complainant stated that after she reported Ms. Gonzalez's sexual harassment, Complainant's career was over, and she knew she would never be appointed Deputy Director. *Id*. Therefore, Complainant believed it was a waste of time and effort to file her own complainant. *Id*.

According to Complainant, after Ms. Gonzalez filed a complaint against Complainant, Director Farrell told Complainant it was "no big deal." ROI § 1.6. Complainant claimed that Director Farrell told her he helped Ms. Gonzalez draft and correct her complaint, but that Complainant should not worry because Ms. Gonzalez's complaint was "not going anywhere." *Id*. Complainant stated that Director Farrell previously told Ms. Gonzalez to file a complaint against a former employee who had filed a sexual harassment complaint against Ms. Gonzalez. Complainant believed Director Farrell encouraged Ms. Gonzalez to file a complainant against Complainant so that he could justify assigning Ms. Gonzalez to areas away from Enforcement.

### Statement of MIDO Director Michael Farrell

Mr. Farrell was hired by the Agency as the MIDO District Director in February 2016. Mr. Farrell is Complainant's supervisor. ROI § 7.10.2.

Director Farrell denied Complainant's claim in its entirety. He asserted that Complainant exercises control over all of her supervisory duties, including supervising subordinates, responding to Congressional inquiries, and completing reports. ROI § 7.10.2. Since the MIDO does not have a Deputy Director, he relies upon Complainant to perform her Enforcement Manager duties. Director Farrell does not believe Complainant recognizes the importance of her position. *Id*. Director Farrell explained that, as the Enforcement Manager, and current "second in command," Complainant can "step in and assist" in the resolution of personnel matters, and Director Farrell stated that he pushes Complainant to perform her duties. *Id*.

Director Farrell stated that it became apparent to him that Complainant and Ms. Peters could not work together. ROI § 7.10.2. Sometime in 2017, Director Farrell decided to remove Ms. Peters from Complainant's supervision "for the sake of keeping the office moving." *Id*. Ms. Peters displayed hostility toward Complainant in regard to every decision Complainant made and vice versa. *Id*. According to Director Farrell, Complainant and Ms. Peters were unable to have a rational discussion without "having a screaming match." *Id*. Director Farrell noted that Complainant and Ms. Peters would not look at each other during meetings, and he described an animosity between the two which was palpable. *Id*. Director Farrell explained to Complainant that he could not run the office with her and Ms. Peters "at each other's throats." *Id*. Therefore, Director Farrell placed Ms. Peters under his direct supervision. *Id*.

Director Farrell indicated that he assigned Ms. Gonzalez to work with the MIDO federal sector team to "ensure a smooth transition" after Ms. Gonzalez returned from a suspension and was demoted to an Investigator. ROI § 7.10.2. Ms. Gonzalez was directed to report to SAJ Kokenge for approximately six months, during which time she conducted settlement conferences. *Id*. Director Farrell believed that by assigning Ms. Gonzalez to the federal sector and moving her to another floor, she would not be required to interact with the two individuals who previously filed sexual harassment claims against her. *Id*. Director Farrell also stated that Ms. Gonzalez had filed EEO complaints against Complainant and two Enforcement Supervisors when she returned from her suspension, and assigning Ms. Gonzalez to the federal sector would avoid the possibility of retaliation. *Id*. Director Farrell acknowledged that Ms. Gonzalez was eventually assigned to work on private sector cases to reduce MIDO's backlog. *Id*. By April 2019, Ms. Gonzalez was reporting directly to Tampa Field Office Director Evangeline Hawthorne, and Director Farrell remained Ms. Gonzalez's reviewer. *Id*.

Director Farrell asserted that, in February 2018, Investigative Support Assistant Robert Tom reported seeing Ms. Gonzalez in his supervisor Linda Byars' office. ROI § 7.10.2. As noted, Mr. Tom had filed a sexual harassment claim against Ms. Gonzalez. Mr. Tom told Complainant and Director Farrell that he was uncomfortable reporting to Ms. Byars because of her friendship with Ms. Gonzalez, and the potential for bias. *Id*. Director Farrell removed Mr. Tom from Ms. Byars' supervision and placed him under Complainant's direct supervision "to avoid the appearance of impropriety." *Id*. Director Farrell believed Mr. Tom was comfortable confiding in Complainant, and Mr. Tom has not subsequently complained of retaliation. *Id*.

Director Farrell noted that Mr. Tom directly reports to Complainant, and she has day-to-day responsibility for his work. ROI § 7.10.2. Normally, Complainant or one of the Enforcement Supervisors assigns Mr. Tom work, but Complainant has the right to intervene to select his work and control his workload. Complainant is the rating official on Mr. Tom's performance review. *Id*.

Director Farrell stated that he also assigned Juan Nieves to work under Complainant's supervision. ROI § 7.10.2. Director Farrell noted that Mr. Nieves had been disciplined while working under Ms. Ricardo and Ms. Gonzalez, and he assigned Mr. Nieves to Complainant because she was the Enforcement Manager. *Id*. According to Director Farrell, Complainant oversees Mr. Nieves' daily duties and is his rating official. *Id*.

Director Farrell contended that the Agency's Office of Field Programs instituted an Agency-wide initiative to delegate signature authority to individuals at lower grade levels who are "competent, capable, and qualified" to sign dismissals. ROI § 7.10.2. The practice was not unique to Complainant or the MIDO. *Id*. Director Farrell has given employees at the GS-13 grade level the authority to sign dismissals. *Id*.

Director Farrell asserted that he never forbid Complainant from meeting with managers or staff. ROI § 7.10.2.  He has consistently suggested, however, that Complainant refrain from socializing with a few managers or staff members because it creates the appearance of favoritism.[7]  *Id*. Director Farrell indicated that he will continue to stress this with Complainant, but stated she "will likely continue to ignore [him]."  *Id*.  Director Farrell denied stating that he would be running the Enforcement Unit. Id.  Director Farrell stated that, because the MIDO lacks a Deputy Director, he needs Complainant to be an effective Enforcement Manager, and he cannot run the MIDO by himself.  *Id*.

Director Farrell stated that if a Supervisor notifies him of an issue with a subordinate, he always asks whether they have addressed the matter with Complainant first. ROI § 7.10.2.  If Complainant is not in the office, he will address the issue, but has included Complainant in these meetings by telephone if she is working from home.  *Id*.

Director Farrell denied that Complainant has been excluded from meetings.  ROI § 7.10.2. Director Farrell stated that Complainant is invited and expected to attend all staff meetings.  *Id*. Complainant is always included in biweekly district-wide Enforcement Manager meetings, and sits next to Director Farrell.  *Id*.  Director Farrell also noted that Complainant is invited to attend "stand-down" meetings.  *Id*.

Director Farrell stated that, at times, he assigned Complainant to oversee the Tampa Field Office and San Juan Local Office, and has not excluded Complainant from overseeing either office.  ROI § 7.10.2.  In May 2016, the Tampa Director left that office and the Tampa Enforcement Manager subsequently left in June 2016.  Complainant was detailed to the Tampa Office for 90 days, because the Office no longer had an upper-level manager.  *Id*.  Director Farrell stated that he spoke with Complainant daily during this time, and Complainant repeatedly referred to the detail as "punishment."  *Id*.

Director Farrell sent Complainant to the San Juan Office in September 2017, to get the office up and running after a hurricane.  ROI § 7.10.2.  Complainant's help was needed to deal with structural issues, delays in cases, and difficulty reaching parties, because Complainant was completely bilingual.  *Id*.  Complainant spent several weeks at the San Juan Office without him, and was the "de facto person in charge."  *Id*.

Director Farrell stated that Complainant can visit the Tampa or San Juan office at any time, but has never asked to do so.  *Id*.  Director Farrell claimed that Complainant responded negatively when asked to assist at either office.  *Id*.

With regard to Mr. Black, Director Farrell noted that Mr. Black returned to MIDO as a contractor in February 2018, and was assigned to work with State and Local Coordinator Ina Depaz.  ROI § 7.10.2.  Mr. Black worked on state and local cases, and came into the office once a week.  *Id*.  Mr. Black also assisted with aged inventory in Enforcement, including a large number of cases in Ms.

---

[7] Complainant indicated that Director Farrell never advised her not to socialize with MIDO managers or staff, and stated she does not socialize with people in the office.  Complainant acknowledged having lunch with Supervisor Administrative Judge Patrick Kokenge, but stated Director Farrell never raised this issue with her.  ROI § 1.6. Complainant denied socializing with other employees in the MIDO.  *Id*.

Peters' unit.  *Id*.    Director Farrell stated that he did not hire Mr. Black to harass or discriminate against Complainant, but he later learned, after Mr. Black returned, that Complainant did not like Mr. Black.  *Id*.

Director Farrell noted that Complainant had a stroke in January 2018, and was off work for several weeks. ROI § 7.10.2.  Director Farrell discussed the situation with Complainant when she returned to work.  Director Farrell described Complainant as "angry," stating that Complainant "went on a tirade," blamed Director Farrell for her stroke, and stated Mr. Black was a racist who caused "every problem in the MIDO"  *Id*.  Director Farrell asserted that Complainant accused him of bringing Mr. Black back in order to return him to the Deputy Director position.  Director Farrell denies asking for Complainant's forgiveness for not providing her advanced notice of Mr. Black's return, and stated that Complainant was not a factor in his decision to hire Mr. Black as a contractor.  *Id*.

Director Farrell acknowledged that Mr. Black was the Deputy Director at the time Ms. Gonzalez had an affair with a subordinate.  ROI § 7.10.2. Director Farrell did not believe Complainant's claim that she informed Mr. Black of the affair and was told to "mind [her] own business."  *Id*. Director Farrell believed Mr. Black was more credible than Complainant.  Id.  Director Farrell stated that even if he believed Complainant's assertion that Mr. Black refused to act when told of Ms. Gonzalez's affair with her subordinate, that did not "absolve" Complainant of her responsibility to act because Complainant was Ms. Gonzalez's supervisor at the time.  *Id*.

Director Farrell stated he was unaware of any discriminatory animus that Mr. Black had toward Complainant.  ROI § 7.10.2.  Director Farrell never heard Mr. Black make any comments that would indicate a discriminatory animus.  *Id*.  If Director Farrell had heard from others that Mr. Black exhibited animus toward Complainant, he would not have believed it was true.  *Id*.

Director Farrell does not believe Mr. Black is a racist.  ROI § 7.10.2.  Director Farrell does not know anyone other than Complainant who believes Mr. Black is racist.  *Id*.  Director Farrell asserted that he has observed Mr. Black discipline and award employees of all races.  *Id*.

Director Farrell denied favoring or supporting Ms. Gonzalez.  ROI § 7.10.2.  He also denied stating that he would defend Ms. Gonzalez or that he did not want Ms. Gonzalez to be embarrassed by her demotion.  *Id*.

In August 2016, Complainant informed Director Farrell that Investigative Support Assistant Robert Tom, complained he was being sexually harassed by Ms. Gonzalez.  § 7.10.2.  Director Farrell told Complainant that he needed a statement from Mr. Tom, because he had denied being harassed.  *Id*.  Director Farrell stated that SAJ Kokenge followed up with Mr. Tom on three occasions while Director Farrell was away, but Mr. Tom either denied being harassed or failed to provide information in the matter.  *Id*.  Director Farrell told Complainant to follow up with Mr. Tom, but Complainant never reported back to him.  *Id*.  Director Farrell believed that Complainant was withholding information, because "Complainant could not have known if there was an ongoing affair."  *Id*.

According to Director Farrell, two individuals from the Agency's OIG appeared at the MIDO with no prior notice.[8]  § 7.10.2.  He was asked to produce various case processing records, and the individuals asked to speak with Complainant  *Id*.  Director Farrell stated he never received any feedback regarding the OIG visit, and as of his April 2019 interview with the EEO Investigator, Director Farrell asserted he was not aware of the reason for the OIG visit.  *Id*.

Director Farrell claimed that he had "no information about any alleged harassment" prior to a complaint being made to the Director of the Agency's Office of Equal Opportunity (OEO) Erica White-Dunston.  § 7.10.2.  After Ms. White-Dunston visited the MIDO in October 2017, Ms. Gonzalez admitted having a sexual relationship with one subordinate, and sexual contact with another subordinate.  *Id*.  Director Farrell asserted that "the only knowledge" he had of Ms. Gonzalez's sexual relationship with Mr. Tom came from Ms. Gonzalez's 2017 admission.  *Id*.  However, Director Farrell acknowledged that, prior to Ms. Gonzalez's admission, and in addition to being told by Complainant of sexual harassment allegations, he received a photo of Ms. Gonzalez's exposed breasts that had been taken at the MIDO.  *Id*.  Director Farrell claimed that he was in the process of drafting a disciplinary proposal for the photo when Ms. Gonzalez admitted to the improper relationships.  *Id*.  Director Farrell stated that once he had Ms. Gonzalez's admission and confirmation of the inappropriate sexual relationships, he felt he had to act because he had "unequivocal evidence." *Id*.

Director Farrell stated that he does not discuss personnel matters with MIDO staff.  *Id*.  While Director Farrell advised Enforcement Supervisors Caddle and Ricardo that Ms. Gonzalez was "severely disciplined," he did not discuss the specifics of the actions.  *Id*.  Director Farrell denied sharing his discussions with the Office of Field Programs Director concerning Ms. Gonzalez's proposed discipline with Complainant, stating there was never any discussion of issuing Ms. Gonzalez only a 10-day suspension.  *Id*.  Director Farrell acknowledged proposing to allow Ms. Gonzalez to choose three pay periods during the year to serve her suspension, stating that he believed that was fair because missing three consecutive paychecks was a hardship.  *Id*.  Director Farrell stated that his proposal was "shot down" by Agency Headquarters.  *Id*.

Director Farrell noted that there was "no single conversation" during which he presented Ms. Gonzalez's proposed discipline to Complainant, and Complainant indicated the discipline was wrong or that Ms. Gonzalez should be terminated.  ROI § 7.10.2.  Director Farrell admitted, however, that he discussed Ms. Gonzalez's discipline with Complainant multiple times over a period of several months, and discussed their "disagreement" about  whether Ms. Gonzalez's conduct toward Investigative Support Assistant Tom and Investigator Mario Hernandez was welcome.  *Id*.  Director Farrell admitted telling Complainant he believed Ms. Gonzalez's encounters with the two men were consensual, but Director Farrell denied telling Complainant he believed Ms. Gonzalez was the "victim."  *Id*.  Director Farrell stated that his belief that the encounters were consensual played no role in the discipline taken against Ms. Gonzalez, and Ms. Gonzalez was appropriately punished for her misconduct.  *Id*.

---

[8] Director Farrell did not provide a specific date of the OIG investigation, but he appears to be referencing the December 2017 investigation cited by Complainant.

Director Farrell stated that he properly disciplined Ms. Gonzalez when he had "tangible evidence" of her misconduct, including "admitted" improper relationships with subordinates, and a photo of Ms. Gonzalez's exposed breasts taken at the MIDO, and when Ms. Gonzalez engaged in insubordination. ROI § 7.10.2. Director Farrell "proposed, accepted, ratified, and implemented" Ms. Gonzalez's "severe discipline," that included a 30-day suspension, removal from her supervisory position, demotion, and reassignment to a different floor. *Id*. Director Farrell claimed that those actions were effective because the misconduct has not recurred, and Director Farrell has denied Ms. Gonzalez's repeated requests to return to the 15th floor. *Id*. Director Farrell asserted that Complainant should have been involved in imposing Ms. Gonzalez's discipline, but Complainant was not because she "does not understand the duties of being Enforcement Manager." *Id*. Director Farrell also stated that while Complainant expressed her belief that Ms. Gonzalez should be terminated, Complainant did not "insist" that Ms. Gonzalez be fired, and Complainant "never stepped up to the plate" to assist in the disciplinary process." *Id.*

Director Farrell denied using the phrase "Team Kat, or telling Complainant she was not on his team. § 7.10.2. Director Farrell indicated that he has never given Complainant any indication that she is not "on his team." *Id*. Director Farrell stated that there is "only one team," and everyone works to serve the District. *Id*.

Director Farrell advised Complainant she herself was creating "two camps" in the MIDO by taking coffee breaks and lunches with select managers and staff. *Id*. Director Farrell believed Complainant's actions demonstrated favoritism, and created divisiveness by forming "two camps," one group of managers and staff that Complainant socialized with, and another group with whom she did not socialize. *Id*.

Director Farrell stated that there was obvious animosity between Ms. Gonzalez, and Complaint, Enforcement Supervisor Caddle, and Enforcement Supervisor Ricardo. ROI § 7.10.2. Director Farrell was unaware of the source of the animosity, but believed Complainant and Ms. Caddle engaged in a "personal vendetta" against Ms. Gonzalez when she was not terminated for her misconduct. *Id*. Director Farrell noted that this began when the photo surfaced of Ms. Gonzalez's breasts, and Complainant, Ms. Caddle, and Ms. Ricardo became angrier as time passed and Ms. Gonzalez was not fired. *Id*. Director Farrell stated that, as the Enforcement Manager, Complainant should have taken appropriate action when she learned Ms. Gonzalez was engaging in an inappropriate relationship several years ago. *Id*.

Director Farrell stated that Ms. Gonzalez was not "banned" from the 15th floor, and he "didn't doubt" that Ms. Gonzalez talked to her friends when she was there. ROI § 7.10.2. Director Farrell noted that he sometimes required Ms. Gonzalez to come to the 15th floor. *Id*. He did not recall Complainant reporting that Ms. Gonzalez had been on the 15th floor, but noted that SAJ Kokenge told him Ms. Gonzalez was there two or three times. *Id*. Director Farrell disagreed that Ms. Gonzalez's presence on the 15th floor would constitute harassment, stating he believed Ms. Gonzalez stayed as far away from Complainant as possible. *Id*.

Director Farrell denied that Complainant or any MIDO employees were discouraged from participating in the EEO process or Harassment Prevention Program. § 7.10.2. Director Farrell noted that at least seven formal EEO complaints had been filed, demonstrating that MIDO

employees seem more inclined to file complaints. *Id*. Director Farrell stated he has seen no evidence that MIDO employees are afraid to complain. *Id*.

Director Farrell denied encouraging or assisting Ms. Gonzalez in filing an EEO complaint against Complainant. ROI § 7.10.2. Director Farrell also denied telling Complainant "not to worry" about Ms. Gonzalez's complaint. He noted that, prior to her suspension, Ms. Gonzalez expressed an interest in filing a complaint against Complainant, Ms. Caddle, and Ms. Ricardo, and he advised Ms. Gonzalez to "think about the fact that [she] would have to answer questions as to why she [was] filing now about matters that happened years ago." *Id*. Director Farrell stated that he asked Ms. Gonzalez to consider whether it was wise to file a complaint when she was being investigated, but asserts that was "the extent of his involvement." *Id*. Director Farrell acknowledged that Ms. Gonzalez asked him to review her typed complaint, but he "did not answer or help her write anything." *Id*.

Director Farrell stated that he did not promise Complainant the Deputy Director position. ROI § 7.10.2. Director Farrell indicated that when he first arrived, he complimented Complainant for completing Congressional inquires and reports which were upper-level management duties. *Id*. He noted that he would not be the selecting official in the event the Deputy Director position was filled, but stated that he had concerns about Complainant's lack of supervisory experience prior to becoming an Enforcement Manager. *Id*.

***Additional Witness Statements***

**a) Patrick Kokenge**

Patrick Kokenge has been the Supervisory Administrative Judge (SAJ) at the MIDO since 1991. ROI § 7.19.2. Mr. Kokenge noted that he does not normally work with Complainant, but that their relationship at work is friendly. *Id*.

Mr. Kokenge stated that he has noticed a change in Complainant's supervisory responsibilities. ROI § 7.19.2. Specifically, he noted that Complainant used to schedule meetings with the Investigator teams, but was told by Director Farrell not to schedule the meetings. *Id*. Director Farrell now personally schedules and conducts these meetings with the teams. *Id*. Complainant first informed SAJ Kokenge that she had been directed not to meet with her subordinates in 2018. ROI § 7.19.2. He believed Complainant's assertion was true, because in addition to Complainant informing him, he observed that Complainant did not meet with MIDO staff. *Id*. No other MIDO employee informed him of any such directive, and Mr. Kokenge noted that Complainant did have informal meetings with individual Enforcement Supervisors. *Id*.

Director Farrell informed SAJ Kokenge in 2017 that Ms. Gonzalez was to report directly to Director Farrell. *Id*. Mr. Kokenge also stated that, in approximately April 2018, Complainant informed him that Ms. Peters no longer reported to her. ROI § 7.19.2. Mr. Kokenge believed that this occurred in response to "some type of complaint" from Ms. Peters. *Id*.

Complainant also informed Mr. Kokenge that Mr. Black disliked her. ROI § 7.19.2. Mr. Kokenge observed that, prior to Mr. Black's retirement, it was clear there was some tension between the two, especially during small group meetings. *Id*.

Mr. Kokenge believed the issues with Ms. Gonzalez were not handled properly. ROI § 7.19.2. There were several Directors involved and the matter went on for some time. *Id*. Mr. Kokenge stated that the troubling thing was that Director Farrell viewed Ms. Gonzalez as the victim, and the male subordinates as the aggressors. *Id*. While Mr. Kokenge disagreed with Director Farrell's handling of the matter, he did not go beyond Director Farrell because he was told Director Farrell was working directly with individuals at Headquarters on the issue. *Id*. Mr. Kokenge believes that given the way Director Farrell handled the matter involving Ms. Gonzalez and the fact it took a long time for any action to be taken when complaints were raised, some employees may be apprehensive to raise complaints. *Id*.

Mr. Kokenge stated that both Complainant and Ms. Caddle informed him that they believed Director Farrell assisted Ms. Gonzalez in filing her complaint against Complainant. ROI § 7.19.2. Mr. Kokenge observed that Ms. Gonzalez was "always" on the 15th floor after Director Farrell told her she was not to be there. Id. Mr. Kokenge noted that he reported Ms. Gonzalez's presence on the 15th floor to Director Farrell a few times. *Id*.

### b) Rosemary Caddle

Rosemary Caddle was promoted to the position of Enforcement Supervisor in January 2017, and has reported directly to Complainant since that time. ROI § 7.5.4.

With regard to Complainant's supervisory duties, Ms. Caddle stated that after Complainant attempted to address issues with Enforcement Supervisor Peter's attendance, Director Farrell removed Ms. Peters from Complainant's supervision. ROI § 7.5.4. Ms. Caddle also noted that Ms. Gonzalez does not report to Complainant even though Ms. Gonzalez works in the Enforcement Unit. *Id*. Mr. Tom and Mr. Nieves, however, have been assigned to work for Complainant. *Id*.

Ms. Caddle stated that Complainant used to conduct MRG meetings with the Investigators. ROI § 7.5.4. Complainant attended MRG meetings until May 2018, after which time, Director Farrell scheduled and attended these meetings and Complainant was not present. *Id*. Ms. Caddle stated that at the time of her interview with the EEO Investigator, both Director Farrell and Complainant attended the MRG meetings. *Id*. Ms. Caddle had no knowledge of any manager specifically directing employees not to meet with Complainant. *Id*.

Ms. Caddle believed that Mr. Black treated Complainant differently than he treated other MIDO employees who he liked. ROI § 7.5.4. According to Ms. Caddle, Mr. Black supported Ms. Peters when complaints were made against her, but did not support Complainant when Complainant attempted to take action in response to the complaints. *Id*.

Ms. Caddle agreed with Complainant's claim that Director Farrell's favoritism of specific managers and employees makes it difficult for employees to raise complaints of discrimination. ROI § 7.5.4. Ms. Caddle asserted that Director Farrell told her there were two teams, those who support Ms. Gonzalez, and those who do not. *Id*.

### c) Jacqueline Gabriel

Jacqueline Gabriel has been employed as an Enforcement Supervisor at the MIDO since 2009. ROI § 7.11.2. Complainant has been Ms. Gabriel's first-line supervisor since 2013. *Id*.

Ms. Gabriel stated that, in approximately January 2019, Complainant mentioned that Director Farrell no longer assigned Complainant regular work, but relegated Complainant to primarily handling Congressional inquiries. ROI § 7.11.2. Ms. Gabriel noted that former Enforcement Supervisor Gonzalez and Enforcement Supervisor Peters were placed under Director Farrell's supervision. With regard to Ms. Peters, Ms. Gabriel stated that Complainant attempted to address Ms. Peters' attendance problems, and Ms. Peters claimed she was being discriminated against. *Id*. Around that same time, Ms. Peters "went off" when Complainant asked her to complete a task during a management meeting, and walked out of the meeting. *Id*. Ms. Peters went to Director Farrell and threatened to resign. Director Farrell then reassigned Ms. Peters to his direct supervision. *Id*.

Although Ms. Gabriel was not aware that Complainant was directed not to meet with Enforcement Supervisors and Investigators, she believed Complainant's claim that she was restricted from meeting with subordinates to be accurate. ROI § 7.11.2. Ms. Gabriel believed, however, that Complainant did not meet with staff because she stopped coming to work on a daily basis. *Id*. Ms. Gabriel noted that Complainant conducted a meeting with Ms. Gabriel's Enforcement Unit in March 2019, but prior to this meeting it had been many months since Complainant held a meeting without Director Farrell being in attendance. *Id*. Ms. Gabriel had no knowledge of any employee being directed not to meet with Complainant. *Id*.

Ms. Gabriel described Director Farrell as "a very knowledgeable person and good and decent individual." ROI § 7.11.2. Ms. Gabriel noted, however, that "a lot of people in the office" perceive Director Farrell as someone who will "blindly believe or buy into" stories people are telling him instead of analyzing the situation. *Id*.

### d) Fernella Peters

Fernella Peters has worked for the MIDO as an Enforcement Supervisor since in August 2010. ROI § 7.30.

Ms. Peters stated that her relationship with Complainant became distant after Complainant made "negative, disparaging comments" about Black people. ROI § 7.30. Ms. Peters claimed that Complainant targeted Black employees, however Ms. Peters noted that there was no way to prove this. *Id*. Ms. Peters cited two employees who she believed were "targeted" by Complainant, but acknowledged that those individuals had performance issues. *Id*. Ms. Peters claimed that employees were afraid of and intimidated by Complainant. *Id*.

Ms. Peters previously worked at the MIDO, and noted that she left the Agency in 2009 because of the way she was treated by Complainant.  *Id*.  When Ms. Peters returned to the MIDO, Complainant had not changed, and Complainant had a "breakfast club" with her favorite employees.  *Id*.  Ms. Peters stated that she complained to Mr. Black that Complainant was making false statements about her and her performance.  *Id*.  She also reported that Complainant and Ms. Caddle were harassing other employees.  *Id*.  Ms. Peters noted that she did not file a complaint against Complainant because Complainant had been promoted to Enforcement Manager, and Ms. Peters tried to deal with the matter on her own.  *Id*.

Ms. Peters claimed that she did not refuse to work under Complainant's supervision.  ROI § 7.30.  She described her situation working under Complainant as "more frustration and hopelessness," stating that regardless of what she did, Complainant subjected her to retaliation.  *Id*.  Ms. Peters indicated that she told Director Farrell she could not continue to work "under the level of stress that [Complainant] was inducing daily."  *Id*.  Ms. Peters now reports to Director Farrell, and Tampa Area Office Director Evangeline Hawthorne is listed as her rater of record.  *Id*.

Ms. Peters stated that she was not aware that any duties were taken away from Complainant.  ROI § 7.30.  Ms. Peters asserted that she has never been directed not to meet with Complainant.  *Id*.  According to Ms. Peters, as of February or March of 2019, Complainant has been meeting with all Enforcement Supervisor who directly report to her.  *Id*.  Ms. Peters indicated that, prior to reporting to Director Farrell, Complainant did not hold any meetings with Ms. Peters, and did not invite Ms. Peters to supervisors' meetings.  *Id*.  Ms. Peters noted that Complainant was frequently out of the office in 2017 and 2018.  *Id*.

Ms. Peters stated that she does not know how Complainant could have been excluded from staff meetings, because Director Farrell sends electronic notifications to the entire MIDO group.  *Id*.  Ms. Peters noted, however, that Complainant did not attend the staff or management meetings conducted by Director Farrell.  *Id*.

Ms. Peters was never under the impression that Mr. Black disliked Complainant.  ROI § 7.30.  Ms. Peters recalled that Mr. Black assisted and trained Complainant when he was Deputy Director.  *Id*.  Ms. Peters believed that Mr. Black and Director Farrell have had discussions with Complainant regarding her alleged favoritism toward certain employees.  *Id*.

Ms. Peters did not believe Director Farrell favored any manager or employee.  ROI § 7.30.  Ms. Peters stated that Director Farrell shares information with MIDO staff, and has an "open door" policy.  *Id*.

### e)  Mercedes Ricardo

In 1999, the Agency hired Mercedes Ricardo as Secretary to the District Director.  Ms. Ricardo has been employed as an Enforcement Supervisor since 2014.  ROI § 7.32.1.  Complainant is Ms. Ricardo's first-level supervisor.

Ms. Ricardo stated that, aside from Ms. Gonzalez and Ms. Peters being removed from Complainant's supervision, she was not aware that any other supervisory duties were removed from Complainant. ROI § 7.32.4. Ms. Ricardo believed that Ms. Peters was removed from Complainant's supervision after Complainant attempted to correct Ms. Peters' attendance issues. *Id*.

Ms. Ricardo was not aware that Complainant had been directed not to meet with her subordinates. ROI § 7.32.4. Ms. Ricardo stated that she has met with Complainant in the past, and can still do so. Id. Ms. Ricardo noted that Complainant had MRG meetings with Director Farrell present. *Id*. Ms. Ricardo did not believe that Complainant was excluded from attending MIDO management or staff meetings. Id. Ms. Ricardo observed that Complainant asked other employees to relay that she was not attending meetings, and this happened more frequently under Mr. Black than Director Farrell. Id. Ms. Ricardo did not know the reason(s) Complainant did not attend these meetings. *Id*.

Complainant told Ms. Ricardo that Mr. Black favored African-Americans employees. ROI § 7.32.4. Complainant also told Ms. Ricardo that Mr. Black did not like Complainant, but Ms. Ricardo did not know whether that was true. *Id*.

Ms. Ricardo did not believe Director Farrell showed favoritism toward any employee in particular. ROI § 7.32.4. She noted, however, that MIDO management did not take immediate corrective action after a sexual harassment complaint was reported to Complainant. *Id*.

**f) Ozzie Black**

Mr. Ozzie Black was employed in the MIDO from 1989 until February 2016, most recently as the Deputy Director (GS-15). He returned as a Contract Investigator in the MIDO for approximately 6 months in 2018.[9] ROI § 7.3.

Mr. Black described his relationship with Complainant as "contentious at times" due to Complainant's confrontational and unproductive management style. ROI § 7.3. Mr. Black asserted that he had no personal issues with Complainant. *Id*. Mr. Black acknowledged that he may have commented on Complainant's management style and performance to Director Farrell while he was working as a contractor. *Id*. Mr. Black does not recall speaking with Complainant during that time, and had no contact with Complainant. *Id*.

**g) Katherine Gonzales**

Ms. Katherine Gonzalez became a Supervisory Investigator for the MIDO in September 2012. ROI § 7.14.2. She was demoted to a GS-12 level Investigator position in February 2018 upon return from a suspension, and informed she would not be reporting to Complainant. *Id*. Instead, Ms. Gonzalez was told to report to the Tampa Area Office, and to Director Farrell. *Id*. Ms. Gonzalez was initially assigned to the MIDO Hearings Unit, and then to the ADR Unit where she investigated cases. *Id*.

---

[9] According to other witness statements, Mr. Black returned to the MIDO in January 2018.

Ms. Gonzalez denied having knowledge of any changes in Complainant's supervisory duties. ROI § 7.14.2. She contended that Complainant "did not do much," and Enforcement Supervisors stamped their own cases when Mr. Black was the Deputy Director. *Id*. Ms. Gonzalez also asserted that Complainant "made comments" about Enforcement Supervisor Peters during a supervisory meeting, and Ms. Peters asked to be removed from Complainant's supervision shortly after Director Farrell arrived at the MIDO. *Id*.

Ms. Gonzalez maintained that Complainant has attended every meeting Ms. Gonzalez has attended. ROI § 7.14.2. Ms. Gonzalez claimed that Director Farrell always included Complainant in "all aspects of enforcement," including meetings and emails. *Id*. In Ms. Gonzalez's opinion, Director Farrell "tried to be fair across the board," met with Supervisors, and kept everyone "on the same page." *Id*.

Ms. Gonzalez also contended that Mr. Black treated everyone fairly. Id. Ms. Gonzalez never witnessed Mr. Black mistreat Complainant. *Id*.

According to Ms. Gonzalez, Ms. Peters claimed that Complainant harassed her. ROI § 7.14.2. Ms. Gonzalez stated that she feared Complainant would retaliated against her, and described Complainant as "malicious." *Id*.

### h) Linda Byars

Linda Byars has been supervising the Charge Receipt Technical Information Unit (CRTIU) since June 2015. ROI § 7.4. Complainant is Ms. Byars' supervisor.

Ms. Byars had no knowledge whether Complainant's supervisory duties were removed. ROI § 7.4. Ms. Byars was aware that Ms. Gonzalez and Ms. Peters were assigned to Director Farrell, but did not know the reason for this reassignment. *Id*.

Ms. Byars also had no knowledge whether Complainant had been ordered not to meet with her subordinates, but stated that Complainant had not had any meetings with her. ROI § 7.4. Further, Ms. Byars indicated that Complainant had not attended meetings which Director Farrell held with MIDO Supervisors, but Complainant has been to staff meetings. *Id*.

Ms. Byars did not know whether Mr. Black disliked Complainant. ROI § 7.4. Ms. Byars believed she has been discriminated against by Complainant and Ms. Ricardo. *Id*. Ms. Byars chose not to report the alleged discrimination, and was "handling" matters herself. *Id*.

### i) Juan Nieves

Juan Nieves has been employed as an Investigator in the MIDO since August 2016. Mr. Nieves was hired by the Agency in July 2015. ROI § 7.28.2. Complainant is his first-line supervisor.

Mr. Nieves asserted that "in practice," Complainant is "the boss of the office." ROI § 7.28.2. He did not know whether Director Farrell removed any of Complainant's supervisory duties, but noted no change in Complainant's supervisory responsibilities. *Id.*

Mr. Nieves did not believe that Complainant was excluded from general staff meetings, but had no knowledge of Complainant's claim. *Id.* Mr. Nieves stated, however, that Director Farrell now "runs" the meetings with managers instead of Complainant. *Id.*

Mr. Nieves believed Complainant's assertion that it was "common knowledge" that Mr. Black disliked Complainant was accurate. ROI § 7.28.2. Mr. Nieves also claimed that Complainant made statements to the effect that she "can be racist" because Mr. Black discriminated against her. *Id.* Mr. Nieves opined that it is "like a rite of passage to be able to discriminate" in the MIDO. *Id.*

Mr. Nieves also believed Complainant accurately asserted that Director Farrell favored specific mangers and employees thereby making it difficult for employees to raise complaints of bias and discrimination for fear of retaliation. ROI § 7.28.2. Mr. Nieves opined that Director Farrell was protecting Ms. Gonzalez and Ms. Peters. Id. Mr. Nieves stated that Complainant "was against" Mr. Black, and now "it is [Director Farrell] against [Complainant]." *Id.*

Mr. Nieves opined that there are two groups in the MIDO, Ms. Gonzalez and her group "against" Complainant, Ms. Ricardo, and Ms. Caddle. ROI § 7.28.2. Mr. Nieves believed that Ms. Peters tries to obtain information from Investigators about their work in order to manipulate the situation to harm" Complainant. *Id.*

### j) Serlo Michael Mathelier

Serlo Michael Mathelier has been employed as a Senior Investigator in the MIDO since 2014. ROI § 7.23. Complainant is Mr. Mathelier's second-line supervisor.

M. Mathelier did not know whether Complainant's supervisory duties were removed. ROI § 7.23. Mr. Mathelier has never been told that Complainant cannot have meetings with her subordinates, and she held a team meeting in early March 2019. *Id.* Mr. Mathelier has not observed Director Farrell show favoritism to anyone. *Id.* Mr. Mathelier stated that Director Farrell is "very direct," and gives fair guidance regarding the needs of the office. *Id.*

### k)  Edras Regisme

Edras Regisme has worked as an Investigator in the MIDO since 2010.  ROI § 7.31.  Complainant is Mr. Regisme's second-line supervisor.

Mr. Regisme stated he was not told that Complainant could not meet with her subordinates, and she held two meetings after employees returned from the 2019 shutdown.  ROI § 7.31.  Prior to those meetings, however, Mr. Regisme noted that Complainant held meetings "once in a blue moon," and Director Farrell scheduled and held staff meetings.  *Id.*

Mr. Regisme never heard that Director Farrell's favoritism of certain employees made it difficult for employees to raise complaints, but stated the biggest problem was "the Black versus Hispanic thing."  ROI § 7.31.  Mr. Regisme noted that while Complainant mentioned her workplace issues around the time she began reporting to Director Farrell, her concerns was not discriminatory or disparaging.  *Id.*

### l)  Roel Ritfeld

Roel Ritfeld works as an Investigator at the MIDO.  ROI § 7.33.2.  Complainant is Mr. Ritfield's second-level supervisor.

Mr. Ritfeld was not aware that there had been a change in Complainant's supervisory duties.  ROI § 7.33.2.  He stated, however, that limiting Complainant's supervisory duties would be "the best for the operation of the office."  *Id.*  Mr. Ritfeld denied being told he could not meet with Complainant, and had not noticed that she was absent from staff meetings.  *Id.*

Mr. Ritfeld did not believe Mr. Black disliked Complainant.  *Id.*  Mr. Ritfeld personally complained about Complainant's hostile behavior toward him and other employees.  Id.  Mr. Ritfeld stated that Mr. Black always remained neutral, and told him to be professional in his interactions with Complainant.  *Id.*

Mr. Ritfeld disagreed with Complainant's assertion that Director Farrell showed favoritism to certain employees, and stated he feels free to discuss anything with Director Farrell.  ROI § 7.33.2.

### m)  Mario Hernandez

Mario Hernandez was hired as an Investigator in the MIDO in April 2009.  ROI § 7.16.2.  Mr. Hernandez stated that Complainant told him her duties had been removed, and he believed Director Farrell removed Ms. Gonzalez from Complainant's supervision because of Ms. Gonzalez's complaint.  ROI § 7.16.2.  Mr. Hernandez noted that Complainant expressed her frustrations to him that she no longer supervises Ms. Gonzalez and Ms. Peters because they filed complaints against her.  *Id.*  Mr. Hernandez stated that Ms. Gonzalez has made negative comments about Complainant, including that Complainant was "out to get her."  *Id.*  Mr. Hernandez also stated that Ms. Peters tells her team not to talk to Complainant because Complainant spreads gossip.  *Id.*

Mr. Hernandez noticed that Complainant had been absent from staff meetings but did not know the reason for her absences.  *Id.*  Mr. Hernandez confirmed that Complainant has met with subordinates on a personal basis.  *Id.*

Mr. Hernandez agreed with Complainant's assertion that Director Farrell's favoritism of specific managers and employees makes it difficult for employees to raise complaints of bias and discrimination out of fear of retaliation.  ROI § 7.16.2.  Mr. Hernandez noted that Director Farrell favored Ms. Peters and Ms. Gonzalez, and Ms. Gonzalez "has a clear line to the Director."  *Id.*  Mr. Hernandez also claimed that Director Farrell favored Ms. Caddle and Ms. Peters.  *Id.*  Mr. Hernandez noted, however, that all managers engaged in favoritism, and retaliation was "rampant."  *Id.*

### n)  Debrick Slater

Debrick Slater has been employed as Investigator in the MIDO since April 1999.  ROI § 7.34.  Complainant is Ms. Slater's second-level supervisor.

Ms. Slater did not know whether Complainant's supervisory duties were removed.  ROI § 7.34.  Ms. Slater stated that, although she does not know whether Complainant was ordered not to meet with subordinates, MIDO staff had not met with Complainant without Director Farrell being present "in a while."  *Id.*

Ms. Slater indicated that MIDO staff may believe that Director Farrell showed favoritism toward Ms. Gonzalez.  ROI § 7.34.  According to Ms. Slater, despite complaints being filed against Ms. Gonzalez and Ms. Gonzalez acknowledging some of the more serious allegations, Ms. Gonzalez appeared to be in a "cushioning (sic)" position.  *Id.*  Ms. Slater opined that Ms. Gonzalez would have been fired if she had been a male supervisor, which shows favoritism.  *Id.*  Ms. Slater stated that Ms. Gonzalez acts as if nothing happened, and seems to be better off, which "takes a toll" on the alleged victims.  *Id.*

Ms. Slater expressed concern that, by providing testimony in this case that was not anonymous, she might be subject to retaliation.  ROI § 7.34.  Ms. Slater indicated that she would have serious concerns working under Ms. Caddle, Ms. Peters, or Ms. Ricardo, because she could be exposed to retaliation.  *Id.*

Ms. Slater had no knowledge of whether Director Farrell or Ms. Peters assisted Ms. Gonzalez with drafting her complaint against Complainant.  ROI § 7.34.

### o)  Robert Tom

Robert Tom was hired as an Office Automation Assistant (OAA) at the MIDO in August 2015.  ROI § 7.35.  He has been employed as an Investigative Services Assistant (ISA) since April 2017.  Mr. Tom indicated that Complainant is "unofficially" assigned to be his reviewing supervisor but does not review his work.  *Id.*

Mr. Tom did not know whether Complainant's supervisory duties had been removed. ROI § 7.35. Mr. Tom stated that Complainant meets with subordinates "all the time in her office." *Id*. Specifically, Mr. Tom indicated that Complainant has met with Mr. Nieves and Mario Hernandez. *Id*. Mr. Tom claimed that no one directed MIDO employees not to meet with Complainant. *Id*.

Mr. Tom asserted that he worked with Mr. Black, and did not observe anything indicating that Mr. Black disliked Complainant. *Id*. Mr. Tom noted, however, that Ms. Gonzalez received favorable treatment, and "there is a fear of retaliation" based on what happened to him. *Id*.

### p) Ines Lozano

Ines Lozano works as an Investigator at the MIDO. ROI § 7.21. Ms. Lozano works in Ms. Peters' unit. Ms. Lozano was not aware that Complainant was told not to meet with staff. *Id*. Ms. Lozano believed that Complainant met with Ms. Caddle's group, and recalled that Complainant was present at all staff meetings. *Id*. Ms. Lozano did not know why Ms. Peters and Ms. Gonzalez no longer report to Complainant. *Id*.

Ms. Lozano has not witnessed Director Farrell demonstrate favoritism. ROI § 7.21. Ms. Lozano stated that Director Farrell made it clear that he has an open-door policy, and anyone can feel comfortable coming to him directly with concerns. *Id*.

### q) LaTasha Nelson

LaTasha Nelson has been working as an Investigator at the MIDO for approximately seven years. ROI § 7.27. Complainant is Ms. Nelson's second-level supervisor. Ms. Nelson was not aware that Complainant's supervisory duties had changed, or that Complainant was directed not to meet with her subordinates. *Id*. Ms. Nelson was not aware that Director Farrell showed favoritism to any employee, supervisory or non-supervisory. Id. Ms. Nelson indicated that Director Farrell "demonstrates fairness across the board." *Id*.

### r) Pablo Alfonso

Pablo Alfonso works in the MIDO. ROI § 7.1. Mr. Alfonso did not know whether Complainant's supervisory duties had been removed, or whether Complainant was instructed not to meet with MIDO staff. *Id*. Mr. Alfonso believed that Complainant has met with MIDO supervisors while Director Farrell is out of the office, and she still attends general staff meetings. *Id*. Mr. Alfonso noted that staff are encouraged to go to their first-line supervisors with problems, but if the supervisor is not available employees go to Complainant for advice. *Id*. Mr. Alfonso stated that Director Farrell as an open door policy, and employees do not have to go through a supervisor to speak with him. *Id*.

### s) Alyssa Keene

Alyssa Keene works in the MIDO as an Investigator. ROI § 7.18. Complainant is her second-level supervisor. Ms. Keene stated that Complainant has not met with her in a long time, and she last saw Complainant in a case review meeting approximately one year ago. *Id*. Ms. Keene did not know whether Complainant was purposefully excluded from meetings. *Id*.

Ms. Keene stated that, given the environment in the office, nothing will happen if there is a complaint against a member of management, and managers are "allowed" to retaliate. *Id*. Ms. Keene stated that she has heard Ms. Peters speak disrespectfully to Black charging parties, and make negative comments about their appearance. *Id*.

## ANALYSIS

*Disparate Treatment Claims 1-3*

Complainant can establish a *prima facie* case of reprisal discrimination by presenting facts that, if unexplained, reasonably give rise to an inference of discrimination. *Shapiro v. Social Sec Admin.*, EEOC Request No. 05960403 (Dec. 6, 1996) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Specifically, in a reprisal claim, a complainant may establish a *prima facie* case of reprisal by showing that: (1) she engaged in a protected activity; (2) the Agency was aware of the protected activity; (3) subsequently, she was subjected to adverse treatment by the Agency; and (4) a nexus exists between the protected activity and the adverse treatment. *Whitmire v. Dep't of the Air Force*, EEOC Appeal No. 01A00340 (Sept. 25, 2000); *Hochstadt v. Worcester Found. for Experimental Biology*, 425 F. Supp. 318, 324 (D. Mass.), aff'd, 545 F.2d 222 (1st Cir. 1976). The burden of production then shifts to the Agency to articulate a legitimate, nondiscriminatory reason for the adverse employment action. In order to satisfy her burden of proof, Complainant must then demonstrate by a preponderance of the evidence that the Agency's proffered reason is a pretext for retaliation.

With regard to the first element, the Commission has stated that the anti-retaliation provisions of the applicable statutes make it unlawful to discriminate because an individual has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing. EEOC Enforcement Guidance on Retaliation and Related Issues, EEOC Notice 915.004 (Aug. 25, 2016). This languages, known as the "participation clause," broadly protects EEO participation regardless of whether the individual has a reasonable, good faith belief that the underlying allegations are, or could become unlawful conduct. Further, reporting discriminatory harassment is considered protected activity. *See Bailin v. Soc. Sec. Admin.*, EEOC Appeal No. 0120080181 (July 14, 2011).

The Commission has a policy of considering reprisal claims with a broad view of coverage. *See Carroll v. Dep't of the Army*, EEOC Request No. 05970939 (Apr. 4, 2000). Under Commission policy, adverse actions need not qualify as "ultimate employment actions" or materially affect the terms and conditions of employment to constitute retaliation. EEOC Enforcement Guidance on Retaliation and Related Issues, No. 915.004 § II.B(2) (Aug. 25, 2016). The statutory retaliation clauses prohibit any adverse treatment that is based upon a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity. *Lindsey v. U.S.*

*Postal Serv.*, EEOC Request No. 05980410 (Nov. 4, 1999). Retaliation claims occur under three circumstances: (1) where the plaintiff suffered from some type of adverse employment action; (2) where the plaintiff was subject to retaliatory harassment by a supervisor; and (3) where the plaintiff suffered from retaliatory harassment by coworkers. *See Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000); *Hawkins v. Anheuser Busch, Inc.*, 517 F.3d 321, 346 (6th Cir. 2008); *Taryn S v. Dep't of Veterans Affairs*, EEOC Appeal No. 0120162172 (Sept. 14, 2018), *request for reconsideration denied*, EEOC Request No. 2019000439 (Feb. 5, 2019).

The statutory anti-retaliation provisions prohibit any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter a reasonable employee from engaging in protected activity. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). On the one hand, petty slights and trivial annoyances are not actionable. On the other, adverse actions or threats to take adverse actions such as reprimands, negative evaluations, and harassment are actionable. EEOC Enforcement Guidance on Retaliation and Related Issues, EEOC Notice No. 915.004, § II(B) (Aug. 25, 2016).

In this case, the record shows that Complainant engaged in protected EEO activity when she reported allegations of sexual harassment by Ms. Gonzalez to Director Farrell in 2016, and when she served as a witness in the Agency's investigation of these sexual harassment allegations in October 2017. Further, it is clear that Director Farrell was aware of Complainant's actions.

With regard to Complainant's specific allegations, the record does not support Complainant's claim that she was retaliated against when her supervisory duties were removed. Complainant's claim relies, primarily, on the reassignment of Ms. Peters and Ms. Gonzalez from under her supervision. While it is uncontested that these individuals were removed from Complainant's supervision and reassigned directly to Director Farrell, the record does not demonstrate that the actions were retaliatory. According to the witness statements of record, Complainant's relationship with Ms. Peters was contentious, and Ms. Peters requested to be reassigned from Complainant's supervision. In addition, Ms. Gonzalez was reassigned from the Enforcement unit as a result of sexual harassment complaints filed by her subordinates. There is no evidence that either Ms. Peters or Ms. Gonzalez were reassigned from Complainant in retaliation for Complainant's EEO activity.

Complainant cited other examples in support of her claim, including being required to sign Mr. Tom's evaluation despite not being his supervisor, and Director Farrell allowing Supervisors to sign off on "no cause" findings. With regard to Mr. Tom's evaluation, Director Farrell stated that he assigned Mr. Tom to work under Complainant because Mr. Tom expressed concerns that his prior supervisor was biased against him. According to Director Farrell, Complainant oversees Mr. Tom's work. Director Farrell also noted that he assigned Mr. Nieves to work under Complainant's supervision. Ms. Caddle confirmed that both Mr. Tom and Mr. Nieves were reassigned to Complainant. Further, Director Farrell indicated that he delegated signature authority for case dismissals to GS-13 level employees as part of an Agency-wide initiative.

Director Farrell stated that he needs Complainant to perform her duties and be an effective Enforcement Manager because there is no Deputy Director at the MIDO. Director Farrell asserted that Complainant exercises control over all of her supervisory duties. While Complainant stated

that she was never told of an initiative concerning signature authority, she did not present any evidence to dispute Director Farrell's assertions on that matter, nor did Complainant present any additional evidence showing that Director Farrell removed other supervisory duties from her. Therefore, Complainant failed to prove her claim of retaliation with regard to her supervisory duties.

The evidence of record also does not support Complainant's claim that she was retaliated against with regard to meetings. Director Farrell stated that he never instructed Complainant not to meet with managers or staff, and he included Complainant in meetings by phone if she was working from home. He also noted that Complainant was invited to attend all meetings. All of the witnesses either denied being advised not to meet with Complainant, or had no knowledge of any such instructions. Several employees observed that Complainant had not recently attended supervisory meetings, and that Director Farrell began personally scheduling and conducting meetings with the teams. Other witnesses, however, indicated that Complainant and Director Farrell both attended those meetings, and that Complainant attended staff meetings and met with employees individually.

While there appears to have been a brief period beginning in May 2018 during which Complainant did not attend case review meetings, the evidence of record is insufficient to prove that Complainant's absence from meetings was related to her prior EEO activity. Some witnesses opined that Complainant did not attend meetings because she was not in the office every day, and, as noted, there is evidence that Complainant attended at least some meetings with Director Farrell. Further, witness statements in the record show that Complainant began holding meetings with staff without Director Farrell being present following the government shutdown.[10] Ms. Caddle acknowledged that at the time of her interview with the EEO Investigator, both Complainant and Director Farrell were attending case review meetings. Ms. Gabriel noted that Complainant held a meeting with her unit in March 2019 without Director being present, and Ms. Peters also stated that Complainant had been meeting with all Enforcement Supervisors who directly report to her since February or March 2019. Several other witnesses confirmed that Complainant met with staff following the shutdown. Therefore, Complainant failed to prove her claim of retaliation regarding meetings.

*Retaliatory Harassment*

The threshold for establishing retaliatory harassment is different than for discriminatory hostile work environment. Retaliatory harassing conduct can be challenged even if it is not severe or pervasive enough to alter the terms and conditions of employment. If the conduct would be sufficiently material to deter protected activity in the given context, even if it were insufficiently severe or pervasive to create a hostile work environment, there would be actionable retaliation. EEOC Enforcement Guidance on Retaliation and Related Issues, No. 915.004, Sect. II.B, e.g. 17; *see also Burlington N. & Santa Fe Ry. Co v. White*, 548 U.S. 53 (2006); *see e.g.*, *Martinelli v. Penn Millers Ins. Co.*, 269 F. App'x 226, 230 (3d Cir. 2008) (ruling that after *Burlington Northern*,

---

[10] It is noted that the Agency was closed from December 22, 2018, through January 25, 2019 due to the government shutdown.

an employee claiming "retaliation by workplace harassment" is "no longer required to show that the harassment was severe or pervasive").

In this case, the record does not support a finding that the Agency subjected Complainant to retaliatory harassment. The evidence does not establish that the incidents alleged by Complainant were related to her protected EEO activity. As noted, Complainant has not proven, by a preponderance of the evidence, that she was retaliated against with regard to claims 1 through 3. In addition, the record does not support a finding that Director Farrell hired Mr. Black as a contractor in order to retaliate against or harass Complainant.

It is clear from the record that the work environment in the MIDO during the period in question was acrimonious at best due in large part to management's failure to effectively address sexual harassment allegations involving Ms. Gonzalez that predated Director Farrell's arrival. Despite Director Farrell's assertion that he was not aware of any sexual harassment until Ms. Gonzalez acknowledged having affairs with her subordinates in late 2017 providing him with "tangible evidence" of misconduct, the record shows that he clearly knew or should have known of the harassment in 2016. Director Farrell admitted that Complainant told him in 2016 that at least one employee had alleged being sexually harassed by Ms. Gonzalez. Director Farrell also acknowledged receiving a photo of Ms. Gonzalez's breasts that had been taken in the MIDO several months before the OEO investigation. Rather than investigating the matter, Director Farrell conceded that he waited until he had "unequivocal evidence" of the harassment before taking any action. Only when Ms. Gonzalez admitted to having inappropriate sexual relationships with her subordinates and the matter was reported to OEO did Director Farrell believe he "had to act."

The record overwhelming demonstrates that Director Farrell failed to take prompt remedial action to address the harassment, and favored or at the very least gave the appearance that he favored Ms. Gonzalez. For example, Director Farrell acknowledged proposing to allow Ms. Gonzalez to serve her suspension over several pay periods so that she would not be financially disadvantaged, describing his proposal as being "fair." He also failed to take action when Ms. Gonzalez repeatedly came to the 15th floor after he told her not to do so. Director Farrell admitted that there was animosity among Complainant and several Enforcement Supervisors toward Ms. Gonzalez, and the managers became angrier as time passed and Ms. Gonzalez was not fired. In addition, several witnesses asserted that Director Farrell favored specific managers and employees.

Nevertheless, the record does not support a finding that Director Farrell's treatment of Ms. Gonzalez was related to Complainant's protected EEO activity. While Director Farrell's actions in contributing to the contentious environment at the MIDO may have been reprehensible and demonstrated a lack of judgment, Complainant has not shown that Director Farrell acted with retaliatory animus toward her or any other employee due to their prior protected EEO activity. In addition, Director Farrell's favorable treatment of Ms. Gonzalez as described in the record was not the type of conduct that would dissuade a reasonable person from engaging in protected activity. There is also no persuasive evidence that Director Farrell encouraged or assisted Ms. Gonzalez in filing a complaint against Complainant. Therefore, Complainant has failed to prove her claim of retaliatory harassment.

## CONCLUSION

For the reasons set forth above, we find that Complainant has failed to establish by a preponderance of the evidence that the Agency subjected her to harassment and retaliation as alleged.  As a result, we hereby **DENY** these claims.

## VI.
## STATEMENT OF RIGHTS

If Complainant is not satisfied with this Decision, her appeal rights are enclosed.

FOR THE COMMISSION:

___26 March 2020_____

Date

mona.papillon@eeoc. Digitally signed by mona.papillon@eeoc.gov
gov                 DN: cn=mona.papillon@eeoc.gov
                    Date: 2020.03.26 13:00:18 -04'00'

Mona Papillon
Deputy Chief Operating Officer

Encl: (Complainant only)
Appeal Rights
Form 573

cc:  Nicholas Inzeo, Director
     Office of Field Programs (OFP)

     Keith Hill, Acting Director
     Field Management Programs, OFP

     Michael Farrell, Director
     Miami District Office

### CERTIFICATE OF MAILING

I certify that on March XX, 2020 a copy of the Commission's Final Agency Decision with appeal rights and attachments was emailed to Complainant at the following address:

> Nitza Wright
> Complainant
> 1911 N. 44th Avenue
> Miami, FL 33021
> Nitza.wright@eeoc.gov
>
> Julie Rook Gold
> Complainant's Representative
> 1100 Wayne Ave., Ste. 900
> Silver Spring, MD 20910
> JGold@GELawyer.com

_____     _____
Date                                                    Equal Opportunity Assistant